Strafford
No. 2001-719

THE STATE OF NEW HAMPSHIRE

v.

RODNEY SMITH

Argued: May 7, 2003
Opinion Issued: July 18, 2003

*Peter W. Heed*, attorney general (*Robert S. Carey*, assistant attorney general, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

BRODERICK, J. The defendant, Rodney Smith, appeals his convictions on one count of attempted murder, *see* RSA 629:1 (1996 & Supp. 2002); RSA 630:1 (1996), and two counts of first degree assault, *see* RSA 631:1 (1996), after a jury trial in the Superior Court (*Mohl*, J.). On appeal, he contends that the trial court erred by allowing the State to impeach its own witness with a prior inconsistent statement. We affirm.

The relevant facts are as follows. The defendant celebrated his twenty-first birthday on July 29, 2000, with a party at his home in Rochester. Alcohol and various drugs were used by many of the attendees. At some point, a fight ensued outside the house between the defendant and Jonathan Oliver. The fight was broken up and the defendant went inside the house, where he entered the bedroom of his friend, Christopher Philo, who lived there. At trial, Philo testified that his hunting knife was on the dresser that night. Upon leaving the bedroom, the defendant went back outside and resumed his fight with Oliver. After he punched the defendant to the ground, Oliver discovered that he was bleeding from three stab wounds. He was taken to the hospital by friends.

The Rochester police arrived shortly thereafter, placed the defendant in protective custody, and transported him to the hospital for treatment of his injuries. While at the hospital, he told the officer who transported him that he would never stab anyone, as it would be against his religion. When Rochester Police Detectives Carlberg and Savitts arrived at the hospital to interview him, the defendant initially denied knowing that Oliver had been stabbed. He admitted, however, that he had retrieved a "steak knife" from the kitchen after his initial confrontation with Oliver and to "swinging" it around at a group of people when he went outside. Finally, although the defendant indicated that he did not intend to stab anyone, he confided that he might have stabbed Oliver.

The police found Philo's hunting knife in the front yard of the house. Later that morning, while the defendant was in the booking room at the Rochester Police Department, Officer Boucher showed him a picture of Philo's knife and asked if it was the knife he had used in the stabbing. According to Officer Boucher, he acknowledged that it was.

At trial, the State called Philo as a witness. He testified that, during a telephone conversation with the defendant a few weeks after the incident, the defendant admitted that he had stabbed Oliver. Philo denied, however, that the defendant stated that he was "glad" and "felt good about it." To impeach this portion of Philo's testimony, the State called Nancy Harris, the director of the victim witness assistance program at the Strafford County Attorney's office. She testified that she had attended a witness interview of Philo, who, in relating a telephone conversation he had with the defendant, said that the defendant acknowledged being "glad about

[stabbing Oliver]," and that he "felt right having done it." After a seven-day trial, the defendant was convicted. This appeal followed.

The defendant argues that a party may not impeach its own witness with a prior statement when the primary purpose for doing so is to place otherwise inadmissible hearsay before the jury. The State counters that it did not call Philo as a subterfuge to present hearsay evidence. Instead, it contends that Philo gave extensive testimony that was crucial to its case. In addition, the State argues that the trial court minimized any potential misuse of Harris' testimony by instructing the jury, before the impeachment evidence was introduced, that it could not be used substantively, but only to evaluate Philo's credibility.

■ New Hampshire Rule of Evidence 607 provides that the "credibility of a witness may be attacked by any party, including the party calling the witness." New Hampshire Rule of Evidence 613(b) provides that such impeachment may be accomplished by use of a prior inconsistent statement. We have construed Rule 607 as enabling a trial court, in the exercise of its sound discretion, to allow a witness's prior statements to be used for impeachment purposes even when the party calling the witness already knows the substance of the anticipated trial testimony and is, therefore, not surprised by it. *See State v. Soldi*, 145 N.H. 571, 573 (2000). We will not reverse a trial court's ruling on the admissibility of said evidence absent an unsustainable exercise of discretion. *See State v. Bader*, 148 N.H. 265, 274 (2002), *cert. denied*, 123 S. Ct. 1945 (2003).

In *Soldi*, we stated:

> While the [witness's] prior inconsistent statement may be admitted to attack [his] credibility even if the statement tends to directly inculpate the defendant, the State may not use a statement under the guise of impeachment for the *primary* purpose of placing before the jury otherwise inadmissible substantive evidence. This limitation prevents the State from using impeachment by prior inconsistent statement as a mere subterfuge to avoid the hearsay rule.
>
> Where the State has called a witness whose corroborating testimony is instrumental to constructing the State's case, the State has the right to question the witness, and to attempt to impeach [him], about those aspects of [his] testimony that conflict with the State's account of the same events. . . .
>
> In analyzing whether impeachment of a party's own witness would constitute subterfuge, courts look at whether the witness's testimony contains relevant evidence other than the impeaching evidence.

*Soldi,* 145 N.H. at 574 (citations, quotations and brackets omitted).

Philo testified that he owned a hunting knife, that it was on his bedroom dresser the night of the stabbing, and that the defendant had handled the knife prior to the incident. He also testified that he saw the defendant run down the stairs of the house after the initial fight and heard one of his housemates screaming that her brother had been punched in the face and that Oliver had been stabbed. Most importantly, Philo testified that the defendant admitted stabbing Oliver.

In conjunction with the testimony of two other State witnesses, Philo's testimony was instrumental in establishing the State's case. One witness testified that he was in the living room of the house after the initial confrontation between Oliver and the defendant, and saw the defendant, whom he described as raging and angry and "looking for something," walk quickly from the living room into Philo's bedroom. He also testified that the defendant emerged, less than a minute later, after grabbing something in Philo's bedroom, and went back outside with the object in his hand. A second witness testified that she was in Philo's bedroom when the bloodied and "enraged" defendant entered it and paced between Philo's dresser and bed saying, "I'm going to kill him. I'm going to kill him." Finally, she testified that she could not see if the defendant took the knife from Philo's dresser, as his back was to her when he faced the dresser, and she could not see his hands when he left the room.

Although the bulk of Philo's testimony was inculpatory, his denial that the defendant had admitted he was "glad" he had stabbed Oliver and "felt good about it" conflicted with the State's theory that the stabbing was done knowingly. As such, the State was justified in challenging Philo's credibility concerning that point. *See id.*

■ Contrary to the defendant's assertion, we conclude that Philo's testimony contained evidence that was relevant to, and instrumental in, constructing the State's case. Consequently, we cannot say that the trial court committed an unsustainable exercise of discretion when it permitted the State to impeach Philo, following an appropriate limiting instruction, about an aspect of his testimony that conflicted with the State's account of the same events. *See id.*

The defendant further contends that because the jury could not reasonably use Philo's prior inconsistent statement only for the limited purpose of evaluating his credibility, admission of the statement unfairly prejudiced his case. Specifically, he argues that Philo was a prosecution witness whose testimony substantially helped the State, and the State did not intend the prior inconsistent statement as a "general challenge" to his credibility. Rather, he argues that the State sought only to challenge the

credibility of Philo's denial that the defendant had admitted he was glad he had stabbed Oliver, and thus aimed to establish the same inference that substantive admission of the prior inconsistent statement would have established.

Both the State and the defendant cite *State v. Fischer*, 143 N.H. 311, 317 (1999), where we noted that the distinction between using evidence for credibility purposes, as opposed to substantive purposes, is often difficult to discern. The difficulty in making that distinction does not, however, foreclose the ability to make it. In *Fischer*, we stated that the distinction "require[d] a careful explanation in the limiting instruction." *Id.* at 317. Here, the trial court immediately preceded Harris' testimony concerning Philo's prior inconsistent statement with the following limiting instruction:

> It's a foundation question. I'll permit it. Before you do that, members of the jury, to the extent Ms. Harris testifies about statements made by another witness who has previously testified in this case, a Mr. Philo, the testimony from Ms. Harris regarding what Mr. Philo said is not offered to prove the truth of the contents of what he says, that is, Mr. Philo, but rather you are to take that testimony, use it to evaluate the credibility of Mr. Philo as a witness in this case. You may not use it for the truth of the contents of those statements; simply to evaluate his credibility as a witness in the case.

The defendant did not object to this instruction as either improper or untimely. *See State v. Fortier*, 146 N.H. 784, 793 (2001). The limiting instruction minimized the possibility of misuse of Harris' testimony and the potential for unfair prejudice. *See State v. Dean*, 129 N.H. 744, 750 (1987) (defendant's claim of prejudice from potential substantive use of prior consistent statement unfounded, especially in light of trial court's limiting instruction). The jury is presumed to follow the instructions given by the trial court. *Fortier*, 146 N.H. at 793.

Contrary to the defendant's argument, the impeachment testimony was not the only evidence introduced that he knowingly stabbed Oliver. The jury heard testimony that the defendant was enraged after Oliver had hit him in their first encounter; the defendant knew about Philo's hunting knife; he was heard saying, "I'm going to kill him. I'm going to kill him" while in Philo's bedroom; and, after grabbing something in the bedroom, he left the house for the second encounter with something in his hand. The defendant admitted that he swung a knife around at the group outside the house; he admitted to Officer Boucher that he had used the hunting knife; and he admitted to Detectives Carlberg and Savitts that he might have stabbed Oliver.

Finally, the defendant attempts to distinguish this case from our holding in *Soldi*. He argues that admission of the impeachment testimony in *Soldi* was proper because the State had already introduced the victim's doctor's testimony, substantively admissible under an exception to the hearsay rule, that also impeached the victim's testimony. Consequently, he contends the likelihood that the primary purpose of the State's impeachment testimony was to place inadmissible hearsay before the jury was diminished.

The defendant's reliance on *Soldi* is misplaced. In that case, we analyzed the admissibility of the doctor's statements under New Hampshire Rule of Evidence 803(4) solely because the appellant challenged the scope of Rule 803(4). *See Soldi*, 145 N.H. at 573, 575. It is clear, however, that the Rule 803(4) analysis played no part in the calculus of determining the admissibility of the victim's impeachment testimony. *See id.* at 575-77.

*Affirmed.*

BROCK, C.J., and DALIANIS and DUGGAN, JJ., concurred.