Belknap
No. 2003-627

THE STATE OF NEW HAMPSHIRE

v.

DANIEL J. LITTLEFIELD

Argued: October 13, 2004
Opinion Issued: June 16, 2005

332

*Kelly A. Ayotte*, attorney general (*Susan P. McGinnis*, assistant attorney general, on the brief and orally), for the State.

*Sisti Law Offices*, of Chichester (*Jonathan Cohen* on the brief, and *Mark L. Sisti* orally), for the defendant.

BRODERICK, C.J. The defendant, Daniel J. Littlefield, appeals his conviction for negligent homicide, *see* RSA 630:3 (Supp. 2004), following a jury trial in the Superior Court (*Smukler*, J.). We affirm.

The defendant's conviction stemmed from his operation of his father's thirty-six foot Baja performance boat on Lake Winnipesaukee during the night of August 11, 2002. The night was dark, clear and moonless, with light boat traffic, smooth water, and good visibility. At a speed of approximately twenty-eight miles per hour, the bow of the defendant's boat collided with the stern of a twenty-foot Wellcraft motorboat and then the length of the larger boat rode over the smaller boat. Both boats had departed from the Meredith public docks and headed into Meredith Bay. The collision occurred at approximately 9:30 p.m. and resulted in the death of John Hartman, the owner of the smaller boat.

The grand jury returned two indictments against the defendant, alleging alternative theories of negligent homicide. The first indictment (#03-S-006) alleged that he negligently caused the death of another by failing to keep a proper lookout while operating a boat, a class B felony. The second indictment (#03-S-007) alleged that he negligently caused the death of another by being under the influence of intoxicating liquor while operating a boat, a class A felony. The defendant moved unsuccessfully to have the indictments dismissed. At the conclusion of a nineteen-day jury trial, the defendant was found guilty solely of the class B felony. This appeal followed.

The defendant argues that the trial court erred by: (1) instructing the jury concerning his alleged post-collision flight; (2) admitting testimony of an individual who saw a boat acting "furtively"; (3) not instructing the jury on the differences between the duties imposed upon a boater and a motorist involved in an accident; (4) failing to instruct the jury that certain deposition testimony of a forensic laboratory analyst could be considered substantively; (5) allowing the State to argue that the jury should discount the testimony of a witness because her husband lied; (6) failing to define "gross," as used in the term "gross deviation," in response to a jury question; (7) denying his motions to dismiss for insufficiency of the evidence; and (8) utilizing flight as an aggravating factor in his sentencing. We address each issue in turn.

I

Several of the defendant's arguments involve jury instructions. In addressing these arguments, we recognize that "[t]he purpose of the trial

court's charge is to state and explain to the jury, in clear and intelligible language, the rules of law applicable to the case. When reviewing jury instructions, we evaluate allegations of error by interpreting the disputed instructions in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case. We determine if the jury instructions adequately and accurately explain each element of the offense and reverse only if the instructions did not fairly cover the issues of law in the case." *State v. Bortner*, 150 N.H. 504, 512 (2004) (quotations and citations omitted). Whether or not a particular jury instruction is necessary, the scope and wording of jury instructions, and the response to a question from the jury are all within the sound discretion of the trial court, *see State v. Cook*, 148 N.H. 735, 741-42 (2002) (necessity); *State v. Evans*, 150 N.H. 416, 420 (2003) (scope and wording); *State v. Poole*, 150 N.H. 299, 301 (2003) (response to jury question), and we review the trial court's decisions on these matters for an unsustainable exercise of discretion, *see Poole*, 150 N.H. at 301.

The defendant argues that the trial court erred by instructing the jury concerning his alleged post-collision flight. At the outset, we note that in his brief, the defendant made passing reference to "due process" within the context of Part I, Article 19 of the New Hampshire Constitution and the Fourteenth Amendment to the United States Constitution. As these constitutional arguments were neither made in his objection to the relevant jury instruction at trial, nor identified in his notice of appeal, we decline to address them. *See, e.g., Smith v. Shepard*, 144 N.H. 262, 264 (1999).

The defendant contends that the trial court erred by giving a flight instruction that differed from the pattern jury instruction "in that it lacked the language concerning 'flight from the police.'" He argues that his actions were "totally inconsistent with the concept of flight," and that he was prejudiced because:

> [B]y giving the flight instruction when there was no evidence to support it, the jury could easily infer that there *was* evidence that the defendant fled and further, the jury could have followed the trial court's instruction and could have inferred guilt from the defendant's flight.

The trial court gave the following instruction:

> [Y]ou have heard evidence that may show that the defendant fled. It is up to you to decide whether the evidence shows this. If you believe that it does, I instruct you that flight may be motivated by a variety of reasons. Flight does not create a presumption of

guilt. Innocent people sometimes have a fear of authority or feelings of guilt which do not necessarily reflect actual guilt.

However, you may consider flight as tending to show feelings of guilt and you may also consider feelings of guilt as evidence tending to show actual guilt, but you are not required to do so. You should consider the evidence of flight by the evidence [*sic*] in connection with all the other evidence in the case and decide how important you think it is.

Earlier, the trial court had also specifically instructed the jury:

Throughout the trial I have tried to be fair and impartial. Just as you are required to be. If anything that I have said or done during the trial or in these instructions has caused you to think that I favor any party, I now instruct you that I do not favor any party. If you believe that I have expressed or suggested an opinion as to the facts in my rulings, you should ignore such an opinion. It is up to you alone to decide the facts in this case.

■ While it is correct that the trial court's instruction did not contain explicit language concerning flight "from the police," *see* N.H. CRIMINAL JURY INSTRUCTION 1.19 (1985), we find no error either in that omission or in the instruction as a whole. There need not be evidence that a defendant was in direct flight from immediate police apprehension before an instruction on the significance of purported flight may be properly given. *See State v. Torrence*, 134 N.H. 24, 26-27 (1991) (instruction on significance of flight justified following testimony that defendant left jurisdiction following dismissal without prejudice of original indictment, and before being reindicted on same charge); *see also State v. Bruneau*, 131 N.H. 104, 117 (1988) (examples of fugitive behavior customarily thought to justify instruction on significance of flight include flight, escape from custody, resistance to arrest, concealment, assumption of false name).

An instruction on flight is properly given if the jury could reasonably infer that the defendant's flight reflected consciousness of guilt, and flight requires neither the physical act of running nor the reaching of a far-away haven. Flight manifestly does require, however, a purpose to avoid being observed or arrested.

*People v. Crandell*, 760 P.2d 423, 442 (Cal. 1988) (en banc) (citation omitted), *cert. denied*, 490 U.S. 1037 (1989), *overruled on other grounds by People v. Crayton*, 48 P.3d 1136, 1147 (Cal. 2002).

We also disagree with the defendant's contentions that no evidence of flight was introduced, and that his actions were totally inconsistent with the concept of flight because the "evidence showed that [he] actually contacted the police and voluntarily gave them access to himself, the passengers that were on the boat, and consented to have the police search and seize the boat itself." The State presented extensive testimony indicating that the collision of the two boats was not minor, that the defendant must have been aware that he had collided with another boat, and that the individuals on the smaller boat required assistance.

On the evening of August 11, the Hartman boat was occupied by four individuals: John Hartman; his wife, Karen Hartman; their son, Kevin Hartman; and Stephanie O'Brien. Karen and Kevin Hartman and Stephanie O'Brien all testified that Karen screamed before the impact of the collision, and that the collision was violent and loud. Sergeant Ouellette and Lieutenant Dunleavy of the Marine Patrol, and Linda DeNoble, a criminalist with the State Police forensics laboratory, all offered expert testimony that the Hartman boat suffered significant damage.

Kevin Hartman testified that, immediately after the collision, he could see three individuals on the other boat looking toward the Hartman boat. His mother screamed at them for help and to call 911, but he heard no response and saw no action being taken by the individuals. The other boat departed the scene as he attempted to return the Hartman boat to the Meredith docks. Karen Hartman and Stephanie O'Brien corroborated this testimony. Sergeant Ouellette and Lieutenant Dunleavy testified that during sound tests conducted under conditions described by the people on the Littlefield Baja—engines running, CD player on, and the boats approximately 150 feet apart—marine patrol officers on the Littlefield boat clearly heard another officer on a second boat yell "help, call 911."

Evidence was introduced that the defendant attempted to avoid detection. Sergeant Ouellette testified that the Marine Patrol had received reports from "several boaters out on the lake that evening in a close proximity of time of this collision that had seen a boat fitting the description of the defendant's boat without lights on after the collision in that area." Almon Dirth testified that he encountered a boat, similar in description to the defendant's Baja, apparently operating with no navigational or stern lights, coming from the direction of Meredith Bay and heading directly toward the Weirs between 9:30 and 9:45 p.m., in an area where a Marine Patrol boat with flashing blue lights was also operating. Benjamin Heald, another boater on the lake that evening, testified that he illuminated a boat, similar in description to the defendant's Baja, with his spotlight at approximately 9:45 p.m., between Meredith Bay and the Weirs. He testified that the boat was dead in the

water with no lights on at all, and that the boat disappeared by the time Heald reached its former position. Robert Phelps testified that he departed the Meredith docks in his boat at approximately 9:30 p.m. and headed toward the Weirs, shortly after a Baja with three people above deck left the docks. As he proceeded, Phelps saw the blue lights of two or three Marine Patrol boats headed toward Meredith. Phelps testified that after he slowed to enter the Weirs channel, and observed no other boats around his, the Baja that he had seen at the Meredith docks "literally appeared out of nowhere" and unsuccessfully tried to pass his boat in an improper lane of the channel.

Sergeant Ouellette, who was "heavily involved" in the investigation of the collision, testified that the defendant did not call the Marine Patrol or report the collision at any time between August 11 and August 14; and the defendant did not meet with him until September 13 at an interview at the office of Attorney Carroll (the defendant's original attorney). Sergeant Ouellette further testified that it was the defendant's father, William Littlefield, Sr., who contacted Attorney Carroll on August 12, and that Carroll subsequently contacted the Belknap County Attorney's office. The defendant's father and counsel participated in a meeting with Ouellette and the deputy county attorney, and it was the defendant's father who brought the authorities to the Littlefield Baja at a boathouse in the area of the Weirs channel. Lieutenant Dunleavy also testified that it was the defendant's father who notified the Marine Patrol of the possibility that his Baja may have been involved in the August 11 collision, and that the defendant's father brought the authorities to the boat and gave permission to search, seize, and examine it forensically.

■ The trial court's instruction clearly explained that it was solely for the jury to decide whether the evidence indicated flight by the defendant. Further, the instruction explained that if the jury believed that flight was proven, then it was permissible, but not mandatory, for the jury to infer guilt. *See State v. Cassell*, 129 N.H. 22, 23-24 (1986). Finally, the jury was instructed to consider any evidence of flight within the context of all the other evidence in the case. We find no error in the trial court's instruction.

## II

The defendant next argues that the trial court's error in instructing the jury concerning flight was "exacerbated" by admitting "the prejudicial testimony of [Almon Dirth] who saw a boat acting furtively when that boat was clearly not that of the defendant and irrelevant to [the] case." As previously noted, Dirth testified that he encountered a boat, apparently operating with no navigational or stern lights, coming from the direction of

Meredith Bay and heading directly toward the Weirs between 9:30 and 9:45 p.m. on the night of the collision. The defendant argues that Dirth's testimony is irrelevant, and substantially more prejudicial than probative.

> Whether evidence is relevant is a question for the trial court's sound discretion, and we will not overturn its determination absent an unsustainable exercise of discretion. To show an unsustainable exercise of discretion, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

*State v. Mitchell*, 148 N.H. 293, 294-95 (2002) (citations and quotation omitted). The fact of consequence was whether the defendant fled from the scene of his collision with the Hartman boat. Dirth's testimony had a tendency to make the existence of flight more probable than it would have been without the testimony.

While Dirth's description of the boat differed in some respects from the defendant's Baja, those differences did not render his testimony irrelevant. Rather, they simply affected the weight to be afforded his testimony by the jury. Dirth testified that he saw "some sort of a performance boat," approximately twenty-six to twenty-eight feet long, without a large superstructure, but with a low silhouette and a low sleek, swept back windshield. At the helm was one person who was not fully standing in the cockpit, which was approximately one-half to two-thirds forward from the boat's stern. The Littlefield Baja was a thirty-six foot performance boat with a low profile and swept back windshield. The cockpit was approximately two-fifths forward from the stern, with a helm seat that allowed for operation in a standing or seated position, with standing operation as the norm.

The defendant further contends that the boat described by Dirth could not have been the Littlefield Baja because the latter had a red and green light on its bow, while he contends that Dirth saw "a white light on the bow." On direct examination, Dirth described his encounter with the boat that "all of a sudden . . . appeared out of nowhere," and explained:

> And the reason it really caught my attention is because I didn't see the red light or the green light and I didn't see the stern or anchor light . . . . It was like it was black, except all of a sudden I saw a little white light towards the front of the boat and I said what the heck is that all about.

We see nothing in Dirth's testimony to indicate that the boat he observed may not have had a green and red bow light. Instead, his testimony indicated only that such a light was not illuminated.

> [E]vidence does not have to be infallible to be admissible. If it is of aid to a judge or jury, its deficiencies or weaknesses are a matter of defense, which affect the weight of the evidence but do not determine its admissibility.

*State v. Dahood*, 148 N.H. 723, 727 (2002). In denying the defendant's motion to strike Dirth's testimony, the trial judge elaborated on this difference:

> Well, I think that the jury is going to have the opportunity to evaluate the weight of the evidence.
>
> I think given [Dirth's] observations, the time, the angle, that I'll tell you straight out, I mean if the case is—if the [S]tate's case rose or fell on this witness, I would be granting a motion to dismiss, but I recognize that this witness is one piece of evidence among many pieces of evidence and I can't say that it falls below the threshold of admissibility, although its weight is certainly arguable.

In addition, the defendant argues that there was no evidence to corroborate Dirth's testimony. To the contrary, the previously-detailed testimony of Sergeant Ouellette, Benjamin Heald, and Robert Phelps provided such corroboration. Dirth also testified that the boat he saw "wasn't up on plane, which means it was throwing more of a wake." The defendant himself provided corroboration when he testified that, subsequent to the collision, one of the Baja's two drives did not work, and he "plowed, basically, through the water, all the way to the [Weirs] channel."

Finally, the defendant contends that, even if Dirth's testimony was relevant, it should have been excluded as unfairly prejudicial under New Hampshire Rule of Evidence 403. The defendant bases his contention of unfair prejudice upon his previous arguments that the trial court's flight instruction was in error. Having already decided that the trial court did not err in giving the instruction concerning flight, we find that the defendant has not demonstrated any unfair prejudice. In sum, we find no error on the part of the trial court in admitting Dirth's testimony.

## III

The defendant further contends that the "trial court's error in giving the flight instruction was also enhanced by its error in refusing to instruct the

jury on the differences between the duties imposed upon a boater and a motorist under the relevant conduct after an accident statute." At the close of evidence, the defendant sought this instruction "in an attempt to mitigate the prejudice to [him] by the trial court's erroneous flight instruction." Having already decided that the trial court did not err in giving the flight instruction, and because the defendant has not demonstrated any unfair prejudice, we reject his argument.

In denying the defendant's request, the trial court stated:

> With respect to the conduct after an accident [instruction], I don't think it follows that if you leave the scene of an accident or leave the scene of a crime, if you run away, that that in itself is a crime. In an automobile collision case, it is, but it is not in other instances. The flight instruction is not tailored to automobile collisions; it simply indicates a particular type of conduct which, if the jury finds, may lead to particular inferences, and I instruct them as inferences in accordance with pattern.
>
> But the defendant was not charged with conduct after an accident, and the defense had, if you will, notice before I instructed that I was going to decline that instruction, I told you that in chambers, and certainly could have brought to the attention of the jury the law on conduct in its argument, and that could have been the acceptable argument of the law. But I didn't need to instruct on it because he's not been charged on it, and in my discretion, didn't think it was warranted.

■ The defendant's proposed jury instruction was based upon RSA 270:1-a (1999) (amended 2004) ("Drownings and Boating Accident Reports"). We understand his argument to be that, because the statute in effect at the time of the collision did not require a person involved in a boating accident to remain at the scene, the trial court's refusal to give his proposed instruction was error in light of the State's examination of "witnesses about the fact that the defendant and other passengers on the boat did not contact Marine Patrol and fled." We disagree. Assuming, without deciding, that the defendant complied with the requirements of the statute in effect at the time, we note that he was never charged with a violation of the statute. Thus, we agree with the State that the requested instruction was not necessary, as it would have essentially instructed the jury that the defendant did not violate a statute he was not charged with violating. *See State v. Bird*, 122 N.H. 10, 16 (1982) (no error in failing to instruct jury on issue not in dispute).

In sum, we find no error in the denial of the defendant's request for an instruction concerning conduct after an accident.

## IV

The defendant further argues that the trial court erred in failing to instruct the jury that certain deposition testimony of a forensic laboratory analyst could be considered as substantive evidence in the case pursuant to New Hampshire Rule of Evidence 801(d)(1)(A). On appeal, he contends that the trial court's error denied him his right to a fair trial, thus denying his right to due process under Part I, Article 15 of the State Constitution and the Fourteenth Amendment to the Federal Constitution. We first address his claim under the State Constitution, and cite federal opinions for guidance only. *State v. Ball*, 124 N.H. 226, 231-33 (1983). Without reiterating our standard of review, detailed earlier, we underscore that we review the trial court's decision as to whether or not a particular jury instruction is necessary, and the scope and wording of jury instructions, for an unsustainable exercise of discretion. *See Cook*, 148 N.H. at 741-42; *Evans*, 150 N.H. at 420.

The jury heard testimony from various witnesses about whether or not the stern light on the Hartman boat was illuminated on the night of the collision. The status of the stern light was relevant to whether the Hartman boat was visible to the defendant. During the post-collision forensic investigation, Maurice Boudreau, a consultant with the State Police forensics laboratory, examined the stern light. He testified that the light was still operable, but that the lamp filament showed signs of "mild hot shock," or distortion. Boudreau opined that the distortion indicated that the stern light had, at some point, suffered some kind of impact or inertial shock while the lamp was illuminated. He could not, however, tie that impact to any specific incident, such as the collision at issue. Thus, he could not determine whether the stern light was illuminated or not at the time of the collision. Boudreau was cross-examined with his prior sworn deposition testimony about the stern light, but his deposition itself was not admitted into evidence.

During a chambers conference after the jury had been charged, the defendant argued that Boudreau's prior sworn deposition testimony was inconsistent with his trial testimony, and requested that the jury be instructed that his inconsistent deposition testimony could "be used substantively for proof of the facts" under Rule 801(d)(1)(A). The defendant's motion was denied.

The trial court's earlier instructions read, in part:

> [Y]ou are to decide the facts based only on the evidence in this case. The evidence consists of the testimony under oath of the witnesses, exhibits that have been admitted into evidence, the views, and the facts of which I took judicial notice. . . .

. . . .

In deciding which witnesses to believe and how much of their testimony to believe, you should consider both the direct and the cross-examination of the witnesses. If you believe that part of a witness's testimony is false, you may choose to distrust other parts also, but you are not required to do so. Inconsistencies and contradictions within a witness's testimony or between witnesses, do not necessarily mean that you should disbelieve the witness. . . . You should evaluate inconsistencies and contradictions and determine whether they are important or unimportant.

. . . .

Some evidence was introduced for a limited purpose. Specifically, in deciding whether you believe a witness you may consider whether the witness made nonsworn statements before trial that were not consistent with what the witness said at trial. If you find that a witness made an unsworn, inconsistent statement before trial, you may use that statement in deciding whether to believe that witness. You may not use the statement made before trial as proof . . . that the facts in the statement are true. The statement made before trial is only to be used by you in deciding whether to believe a witness.

■ Contrary to the defendant's contention, the instructions did not prevent substantive use of any inconsistent sworn deposition testimony. All of Boudreau's testimony concerning his earlier deposition was elicited either during direct or cross-examination, and the jury was specifically instructed that it should consider both. Furthermore, the trial court's limiting instruction, regarding credibility, applied only to prior *unsworn* inconsistent statements. If the jury did consider Boudreau's testimony concerning his prior sworn deposition to be inconsistent, the instructions placed no limitation on its use as substantive evidence.

The trial court's instructions, viewed in their entirety, explained in clear and intelligible language the issues of law applicable to the case. We find no unsustainable exercise of discretion on the part of the trial court, and no denial of the defendant's right to a fair trial, in the instructions. The Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances. *See, e.g., State v. Parker*, 142 N.H. 319, 324-25 (1997); *United States v. Park*, 421 U.S. 658, 673-76 (1975); *United States v. Smith*, 145 F.3d 458, 460 (1st Cir.), *cert. denied*, 525 U.S. 953 (1998). Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

During deliberations, the jury asked, "Would it be possible to get a transcript of Maurice Boudreau's testimony. He was the forensic expert." The trial court responded, "A transcript can not be provided. You are to rely on your best recollection of the testimony." The defendant now argues that the "error [in the trial court's instructions] was further aggravated by [its] refusal to allow the jury access to the deposition of Mr. [Boudreau] despite [the jury's] specific request to have it." We disagree for several reasons. First, as explained above, there was no error in the applicable jury instructions. Second, the defendant's claim is factually inaccurate. The jury requested a transcript, not of Boudreau's deposition, which had not been entered into evidence, but of his trial testimony. The trial judge has wide discretion in deciding which items admitted into evidence are to be brought into the jury room during deliberations. *Hodgdon v. Frisbie Mem. Hosp.*, 147 N.H. 286, 291 (2001). Courts have taken a dim view of allowing a jury to have testimonial evidence during deliberations that repeats or emphasizes portions of a witness's trial testimony:

> The triers of fact may place more emphasis on written rather than spoken words since the written words are readily before them physically while the spoken words uttered at trial can only be conjured up by memory.

*Id.* (quotation and brackets omitted). Third, nothing in the record indicates that the defendant objected to the trial court's response to the jury. Consequently, the defendant has not properly preserved this issue for our review. *See State v. Gordon*, 147 N.H. 576, 577-78 (2002) (contemporaneous objection required to preserve issue for appeal, particularly where alleged error involves jury instruction). We find no unsustainable exercise of discretion in the trial court's response to the jury's request.

Finally, the defendant apparently contends that the trial court erred by allowing the State to improperly argue in closing "that ... Boudreau's opinion was that the damage done to the stern light was consistent with the lamp being on when the defendant's boat struck the lamp-post." We agree with the State that the defendant has not sufficiently developed this argument for appellate review. *See State v. Blackmer*, 149 N.H. 47, 49 (2003). Further, the record indicates that the defendant did not specifically object to the State's characterization of the substance of Boudreau's opinion. *See State v. Winstead*, 150 N.H. 244, 246 (2003). Even if the defendant had sufficiently developed this argument, however, we fail to see any error by the trial court. We note that Boudreau did testify that the condition of the lamp filament was consistent with the condition he would expect to find if the Hartman boat's stern light had been on when the Littlefield Baja scraped across it with enough force to slowly bend the

stern light pole over, which was the scenario proposed by the accident reconstruction team.

V

The defendant next argues that the trial court erred by allowing "the State to argue that the jury should discount the testimony of [Nancy DeVivo,] because her husband lied." During the course of the trial, the defense called DeVivo, a long-time friend of the defendant and his wife. DeVivo testified that, at approximately 9:15 p.m. on August 11, she and her husband departed the Meredith public docks in their own boat, after they had drinks and dinner with the Littlefields at the Town Docks restaurant in Meredith. The DeVivos departed before the Littlefield Baja did, and they headed for the Weirs channel. Approximately ten minutes later, and for a period of no more than two seconds, DeVivo saw a white boat with a light that went on and off twice. She testified that at the time she saw the other boat, it was headed in the direction of the Weirs, but she could not estimate the distance to the other boat, nor did she know where the other boat had come from. DeVivo's testimony was offered as evidence that the stern light of the Hartman Wellcraft was not illuminated at the time of the collision.

Over the defendant's objection, the trial court allowed the State to argue that DeVivo was not a credible witness. Specifically, the State contended that DeVivo was aware her husband had written "Business lunch" on the receipt for their personal meal that evening, and that the receipt's annotation was a "lie." On appeal, the defendant contends that it was error to allow the State to argue DeVivo's credibility as a witness because her husband may have attempted to falsely claim a business tax deduction for their meal. He argues that this error "further increased" the "prejudice" of the trial court's earlier error of failing to instruct the jury that Maurice Boudreau's deposition testimony was substantive evidence. Although the defendant cites no authority for this thinly developed argument, he apparently contends that DeVivo's testimony was exculpatory; it was therefore consistent with the prior sworn deposition of Boudreau; and the State had no evidence to tie the receipt's annotation to her. We disagree.

First, we reiterate our finding above that the trial court did not err in its instructions to the jury concerning Boudreau's testimony. As such, the defendant's premise of further prejudice is fundamentally flawed. Second, we agree with the State that the defendant has not sufficiently developed this argument for appellate review. *See Blackmer*, 149 N.H. at 49. We also agree with the State that his claim is factually inaccurate. While the defendant claims error in the State's argument concerning the DeVivo's "lunch tab," the record clearly shows that the receipt was for the drinks

and dinner, and not for a lunch, that the DeVivos shared with the Littlefields at the Meredith restaurant.

■ Even if we assumed that it was error for the State to argue DeVivo's credibility, and that the jury consequently discounted DeVivo's testimony, we find that any such error was harmless beyond a reasonable doubt. The State has the burden of proving that error in the course of a criminal trial is harmless beyond a reasonable doubt. In determining whether error was harmless, we consider, among other things, whether the evidence was cumulative, or inconsequential in relation to the State's evidence. *See State v. MacDonald*, 150 N.H. 237, 240 (2003).

DeVivo testified that she saw a boat with a light that went on and off twice in a period of no more than two seconds. The defendant concedes that four people on the Littlefield Baja—the defendant, his wife, Brian Connelly, and Christine Poulicakos—had already testified that they "had seen no lights on the smaller boat prior to the impact." DeVivo's testimony was, therefore, cumulative. It was also inconsequential. Lieutenant Dunleavy testified that a "flickering light" could be explained by some obstruction between the light bulb and the observer. He also testified that, in the case of the Hartman boat, the intermittent flapping of a portion of the boat's canvas top could have caused this obstruction. Because DeVivo's testimony was both cumulative and inconsequential, we find that any error in allowing the State to argue DeVivo's credibility was harmless beyond a reasonable doubt.

## VI

The defendant argues that the trial court erred when it failed to define "gross," as used in the term "gross deviation," in response to a jury question. After the close of evidence, the trial court gave the following instruction:

> Indictment 03-S-006 accuses the defendant of negligent homicide by failing to keep a proper lookout when he was operating his boat. The definition of this crime has two parts, or elements. The State must prove each part of the definition beyond a reasonable doubt. Thus, the State must prove, first, that the defendant caused the death of another person, and second, that the defendant acted negligently.
>
> The first part of the definition requires the State to prove that the defendant did a certain act, in this case, that he caused the death of another. This means that the death of another person was the direct result of the defendant's actions. The second part

of the definition requires the State to prove the defendant's mental state at the time he acted; here, that he acted negligently.

To prove that the defendant acted negligently, the State must prove, first, the defendant failed to become aware of a substantial and unjustifiable risk. This means that you must decide whether the defendant should have been aware that the risk existed and failed to become aware of the risk. Second, the risk was so substantial that the defendant's failure to become aware of the risk was a gross deviation from the conduct that a reasonable person would observe in the situation.

The key words here are "gross deviation." If you find that the defendant's actions were unreasonable or thoughtless, that is not enough. You must find that the defendant's failure to become aware of the risk was a substantial departure from how a reasonable person would have acted under the same circumstances.

Negligence in criminal cases is different from negligence in civil cases. . . .

In criminal cases, negligence requires proof of more than an ordinary risk, that is of a substantial and unjustifiable risk. In addition, the defendant's failure to become aware of the risk must be a gross deviation from how a reasonable person would have acted in the same situation.

Keep in mind that there is often no direct evidence of a defendant's mental state, because there is no way of examining the operation of a person's mind. You should consider all the facts and circumstances in evidence in deciding whether or not the State has proved that the defendant acted negligently.

On the first day of deliberations, the jury asked, "Can we have better clarification of the term 'gross deviation' in the first charge." The trial court responded:

I refer you to my [earlier] instructions at page nine. As it states there, you must first determine how a reasonable person would have acted under the same circumstances. Then you must determine whether the defendant's conduct was a departure from how a reasonable person would have acted. If you determine that the defendant's conduct was a departure, you must determine whether it was a "gross deviation"—in other words, a substantial departure. The words "gross" and "substantial" have no specific legal definition; they are to be considered within their common meaning.

The defendant objected, arguing that the trial court should provide the "common meaning" of the words, utilizing dictionary definitions to define "gross" as "flagrant." On appeal, he contends that the trial court's failure to provide a "dictionary definition of the word 'gross' ... had the effect of denying [him] his right to having a unanimous jury verdict and a fair trial," thus denying his right to due process under Part I, Article 15 of the State Constitution and the Sixth and Fourteenth Amendments to the Federal Constitution. Further, he claims:

> [T]he trial court's answer was not supported by the plain language of RSA 626:2, II(d). Further, it was a misstatement of the law as it instructed the jury to only decide whether the defendant's conduct was a substantial departure from that of a reasonable person in order to find him negligent. The instruction absolves the jury of the two step process of first determining whether there was a substantial and unjustifiable risk and second, whether the defendant's failure to become aware of that risk constituted a "gross deviation" from the conduct of a reasonable person. Further, the trial court's answer does not refer back to the alleged criminal conduct by the defendant, that is, that he did not have a proper lookout while he was operating a boat. The trial court's answer would allow the jury to convict the defendant if it thought his operation of the boat was negligent in any way. It thus served to expand the idea of negligence to include possible uncharged conduct.

The State contends that the defendant did not preserve these further claims for appeal because he failed to object to the court's original negligence instruction, failed to make these specific objections below, and objected only to the final sentence of the trial judge's response. In response to the jury question, the trial judge read his proposed answer in a chambers conference. The defendant asked if the trial judge "want[ed] our position," the judge responded that he did want the defendant's position and any suggestions, and the defendant stated:

> I agree with the—we agree with the Court's instruction up to where you get to, "If you determine that the defendant's conduct was a departure, you must determine whether there was a gross deviation." We agree to it up to that point. Actually, after that, where it says, "in other words ... ," it's a substantial departure, we agree up to that point. ...
>
> . . . .

Oh. The last sentence now reads: "The words 'gross' and 'substantial' have no specific legal definition, they are to be considered within their common meaning."

We disagree with that, on both parts of that sentence, there are two parts to it. And we believe that, first of all, the jury must know the common meaning; and secondly—the common meaning that applies to the situation; secondly, there's a specific meaning, legal meaning that applies to homicide cases.

We agree with the State that the defendant objected only to the final sentence of the trial court's response to the jury question. Consequently, the defendant has preserved only his argument that the trial court's failure to provide a "dictionary definition of the word 'gross'" violated his constitutional right to due process. *See Gordon*, 147 N.H. at 577-78 (contemporaneous objection required to preserve issue for appeal, particularly where alleged error involves jury instruction). We first address his claim under the State Constitution, and cite federal opinions for guidance only. *Ball*, 124 N.H. at 231-33. Without reiterating our standard of review, detailed earlier, we underscore that we review the trial court's response to a question from the jury for an unsustainable exercise of discretion. *Poole*, 150 N.H. at 301.

The trial court's response specifically directed the jury to refer to the written copy of the court's previous instructions. As such, those instructions were incorporated into the court's response. The jury is presumed to follow the instructions given by the trial court. *State v. Smith*, 149 N.H. 693, 697 (2003). As detailed above, the instructions clearly delineated that: (1) the definition of negligent homicide contained two elements, and that it was the State's burden to prove each element beyond a reasonable doubt; (2) the second element, whether or not the defendant acted negligently, entailed a two-part test, requiring the State to prove that the defendant failed to become aware of a substantial and unjustifiable risk, and that the risk was so substantial that the defendant's failure to become aware of the risk was a gross deviation from the conduct that a reasonable person would observe in the situation; (3) there was a difference between criminal negligence and civil negligence; (4) "gross deviation" was a key concept in that difference; (5) gross deviation did not mean that the defendant's failure to become aware of the risk was simply unreasonable or thoughtless; and (6) gross deviation meant that the defendant's failure to become aware of the risk was a "substantial departure" from how a reasonable person would have acted under the same circumstances.

A trial court is under no obligation to answer a jury's question with the specific language requested by a defendant; it is within the trial court's discretion to decide how best to aid the jury in its deliberations. *State v. Zwicker*, 151 N.H. 179, 190 (2004). The legislature has not provided a definition of "gross" in RSA 626:2, II(d) (1996) (definition of "negligently"), and we construe the statute according to the fair import of its terms and to promote justice. *See* RSA 625:3 (1996). "Gross" is not a technical term requiring an elaborate definition by the court. *See Bird*, 122 N.H. at 16 (no error in court's definition of "cause"). The jury instructions made clear that "gross deviation" meant more than a deviation that was simply unreasonable or thoughtless. While "flagrant" might be an adequate definition of "gross," it is by no means an exclusive definition. For all of these reasons, we see no error in the trial court's response, which equated "gross deviation" with "substantial departure" and directed the jury to consider those words as having their common meaning. *See State v. Garcia*, 838 A.2d 1064, 1075 (Conn. App. Ct. 2004) ("[A] gross deviation is a 'great or substantial deviation, not just a slight or moderate deviation.'").

In sum, the trial court's response, which incorporated the earlier instructions, explained in clear and intelligible language the issues of law applicable to the case. We find no unsustainable exercise of discretion on the part of the trial court, and no denial of the defendant's right to a fair trial, in the response given to the question from the jury. The Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances. *See, e.g., Parker*, 142 N.H. at 324-25; *Park*, 421 U.S. at 673-76; *Smith*, 145 F.3d at 460. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

## VII

At the conclusion of the State's case, and again at the close of all the evidence, the defendant unsuccessfully moved to dismiss indictment #03-S-006. The defendant contends that the State "did not present sufficient evidence to support the charge that [he] failed to maintain a proper lookout."

To succeed on his motions to dismiss:

> [T]he defendant had to establish that the evidence viewed in its entirety, giving the State the benefit of all reasonable inferences, was insufficient to prove beyond a reasonable doubt that he was guilty of the crime charged. When reviewing the trial court's denial of a motion to dismiss, we view the evidence and reasonable inferences arising therefrom in the manner most

favorable to the State. We review the entire trial record because, even though the defendant is not required to present a case, if he chooses to do so, he takes the chance that evidence presented in his case may assist in proving the State's case. Therefore, the issue on appeal as to both motions is the same.

*State v. Pittera*, 139 N.H. 257, 260 (1994) (quotations and citations omitted). Further:

To prevail on his challenge to the sufficiency of the evidence, the defendant must prove that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt. When the evidence is solely circumstantial, it must exclude all rational conclusions except guilt. Under this standard, however, we still consider the evidence in the light most favorable to the State and examine each evidentiary item in context, not in isolation.

*Evans*, 150 N.H. at 424 (citations omitted).

At the outset, we emphasize the difference between negligence in criminal cases and negligence in civil cases. Neither the State nor the defendant challenged the trial court's instruction concerning this difference:

Negligence in criminal cases is different from negligence in civil cases. Civil cases involve decisions as to money damages resulting from, for example, an automobile accident. In such cases the negligence standard is lower. Negligence in civil cases is simply the failure to exercise the degree of care that a reasonable person would exercise under the same circumstances.

In criminal cases, negligence requires proof of more than an ordinary risk, that is of a substantial and unjustifiable risk. In addition, the defendant's failure to become aware of the risk must be a gross deviation from how a reasonable person would have acted in the same situation.

■ We recognize that not every act of carelessness that results in a death entails criminal negligence. Accordingly, a person charged with criminal negligence may not be convicted on evidence that establishes only ordinary negligence. Instead:

A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result

from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

*State v. Strescino*, 106 N.H. 554, 556 (1965) (quotation and emphasis omitted); *see* RSA 626:2, II(d). We have previously stated that "[w]hether the defendant failed to become aware of a substantial and unjustifiable risk is determined by an objective test, not by reference to the defendant's subjective perception." *State v. Ebinger*, 135 N.H. 264, 265 (1992) (quotation omitted). We find compelling the words of the Court of Appeals of New York:

[We] have emphasized that criminal liability cannot be predicated on every act of carelessness resulting in death, that the carelessness required for criminal negligence is appreciably more serious than that for ordinary civil negligence, and that the carelessness must be such that its seriousness would be apparent to anyone who shares the community's general sense of right and wrong. . . . [C]riminally negligent homicide requires not only a failure to perceive a risk of death, but also some serious blameworthiness in the conduct that caused it. The risk involved must have been substantial and unjustifiable, and the failure to perceive that risk must have been a gross deviation from reasonable care.

. . . [T]he crime of criminally negligent homicide serves to provide an offense applicable to conduct which is obviously socially undesirable. It proscribes conduct which is inadvertent as to risk only because the actor is insensitive to the interests and claims of other persons in society. The Legislature, in recognizing such conduct as criminal, endeavored to stimulate people towards awareness of the potential consequences of their conduct and influence them to avoid creating undesirable risks.

. . . Hence, unless a defendant has engaged in some blameworthy conduct creating or contributing to a substantial and unjustifiable risk of death, he has not committed the crime of criminally negligent homicide; his nonperception of a risk, even if death results, is not enough.

*People v. Boutin*, 555 N.E.2d 253, 254-55 (N.Y. 1990) (citations, quotations, brackets, ellipsis and emphasis omitted).

Keeping in mind this heightened standard for criminal negligence, and our overall standard of review for a motion to dismiss, we have reviewed the evidence concerning the defendant's failure to keep a proper lookout, only some of which we detail here. We have previously detailed that the collision between the thirty-six foot Littlefield Baja performance boat and the twenty-foot Hartman Wellcraft motorboat occurred on a dark, clear, moonless night, with light boat traffic, smooth water, and good visibility. The Baja was traveling at a speed of approximately twenty-eight miles per hour at the time of the collision. Lieutenant Dunleavy provided expert accident reconstruction testimony that at that speed—some thirty feet per second—it would have taken only one to one and one-half seconds for the length of the defendant's boat to ride over the smaller boat.

There was substantial evidence that the stern light of the Hartman boat was properly illuminated at the time of the collision. Lieutenant Dunleavy testified that the State requires all recreational vessels to carry a white stern light, visible for 360 degrees at a distance of two miles. Kevin Hartman testified that he checked for the "proper navigation lights" before piloting the boat away from the Meredith public docks, and that those lights remained on during and after the collision. Karen Hartman testified that the navigation lights of their boat were on "from the time we left the dock until after we left the docks again in the ambulance." Stephanie O'Brien testified that the navigation lights were turned on when the Hartman boat left the public docks, and that she was able to see the hull of the Baja, including its color and striping, as it ran over Mr. Hartman's chest, because the stern light was on and remained illuminated. Christopher Tsakiris, an assistant service manager at a Laconia marina, testified that he was at the Meredith docks when the Hartman boat returned and that its stern light was on. Steven Plimpton, Tsakiris' friend who was with him that evening at the Town Docks restaurant, testified to the same, and that the stern light was "[v]ery bright."

There was evidence that visibility was good to excellent on the night of August 11. Lieutenant Dunleavy testified that boats can be seen at night even without the proper navigation lights illuminated. Almon Dirth testified that he was able to see the boat he encountered at approximately 150 feet and maneuver to avoid it, although he could not see any navigational or stern lights on the boat. Benjamin Heald testified that the boat he initially illuminated with his spotlight was several thousand feet away from him; that after extinguishing his spotlight he could see that the boat had no navigational lights on; and that he had often encountered boats on the lake at night without some or all of their lights on, yet he had seen them in time to avoid a collision.

There was significant evidence presented concerning the defendant's consumption of alcohol and his attention level that evening. The defendant testified that he drank four beers during the afternoon of August 11. He also testified that he drank two full glasses of wine, and a portion of a third glass, over the course of the evening in Meredith. Steven Plimpton testified that at approximately 9:00 p.m., he observed the defendant grab a railing after apparently stumbling up the stairs from the beach to the bar area of the Town Docks restaurant. Plimpton also testified that he commented to Tsakiris, "Wow, he seems intoxicated." Tsakiris testified to this same incident. Diane Girard, who had known the Littlefields for a number of years, testified that she started to talk with the defendant that evening, but eventually walked away because she couldn't understand him very well; it appeared to her that he had been drinking too much—he was slurring his words, and was unsteady on his feet. Jeff Jaran, the chief of police in Sandwich, knew the defendant as an acquaintance for many years. Chief Jaran testified that he spoke with the defendant that evening. He believed the defendant had had "a lot to drink"; the defendant was obviously impaired and "visibly intoxicated," his speech was slurred, and he was unsteady on his feet.

Judith Kelley, a long-time friend of the defendant's, spoke to the defendant at the Town Docks restaurant that evening. Aware that the defendant had returned the previous day from a two-week business trip overseas, she testified that he "looked tired," and she thought "that maybe he had jet lag or ... he just didn't seem wide awake and bright-eyed." Robert Phelps testified that as the Baja prepared to leave the Meredith docks shortly before 9:30 p.m., he observed that the operator had difficulty installing the boat's stern light, and in pulling away from the dock, because he "realized that he hadn't undone the stern line." The defendant testified that as he piloted the Baja, he held the boat's wheel with one hand and had his other arm around his wife, with whom he carried on a conversation. He further testified that prior to the collision, he was looking "straight ahead" at the lights on the Weirs and some boats "way out in the distance."

Given our standard of review in this case, we believe there was substantial evidence of the defendant's intoxication, his attention level while piloting the Baja, the speed at which he operated his boat on a dark, moonless night, and his failure to see a properly illuminated boat in front of him.

The defendant contends, however, that the jury's verdict of not guilty on indictment #03-S-007 meant that it had reached a unanimous decision that Mr. Hartman's death did not occur because the defendant's ability to operate the Baja was impaired by alcohol to any degree. The defendant

further contends that because the jury acquitted him on indictment #03-S-007, it could not take into account evidence of his intoxication in deciding its verdict on the charge of failure to keep a proper lookout. Thus, he argues that we cannot consider that same evidence in our review of the sufficiency of the evidence. The State argues that the jury could consider the evidence of the defendant's intoxication on the charge of failure to keep a proper lookout. We agree with the State, as our established jurisprudence regarding inconsistent verdicts, and the ability of the jury to consider all of the evidence in deliberating on either charge, belies the defendant's argument. *See State v. Brown*, 132 N.H. 321 (1989); *Ebinger*, 135 N.H. 264; *Pittera*, 139 N.H. 257.

In *State v. Brown*, the defendant was convicted on one count of a three-count indictment for being an accomplice to receiving stolen property on three separate dates. On appeal, he argued that the jury's guilty verdict was inconsistent with the jury's simultaneous acquittals on the other two charges. He asserted that if the jury's verdicts could not be reconciled on a rational basis, his conviction must be reversed. *See Brown*, 132 N.H. at 323, 328. In affirming the defendant's conviction, we stated:

> [U]nder federal and State law, the inconsistency of simultaneous jury verdicts against a single defendant on a multiple-count criminal indictment need not be rationally reconciled, and does not entitle the defendant to relief. . . .
>
> The United States Supreme Court held in 1932 that consistency among multiple-count verdicts is not necessary. Instead, the Court stated that although inconsistent verdicts may show that the jury did not voice its true conclusions in either the acquittal or the conviction, this does not mean that the jury was not convinced of the defendant's guilt. The rationale supporting the Court's decision . . . has been expanded and continues to be relied upon today.
>
> As [*United States v. Powell*, 469 U.S. 57 (1984)] explains, even if inconsistent verdicts reflect jury error, it should not be assumed that they necessarily aid the government. It is just as likely that the jury correctly reached the guilty verdict on one count, and through leniency or mistake arrived at the not guilty verdict on a different count of the same offense. Under these circumstances, the government is prevented by the United States Constitution's double jeopardy clause from appealing an acquittal based upon jury error. The defendant, however, is in a superior position to determine whether the jury irrationally or erroneously arrived at its guilty finding, because he or she can

appeal the verdict based on insufficient evidence. If the appellate court concludes that sufficient evidence was introduced at trial to support a determination of guilt beyond a reasonable doubt, the conviction will stand. Before a court could determine which of two or more inconsistent verdicts, if any, was based on error, mistake, or leniency, it would be necessary to inquire into the jury's deliberations. According to *Powell*, the better rule is to insulate jury verdicts from review under these circumstances.

This court has recently noted, similar to the United States Supreme Court . . . , that although it may be assumed that one of the two inconsistent verdicts is wrong, their inconsistency does not, standing alone, indicate where the error lies. If we were to vacate each verdict, one of our decisions would presumably be wrong on the merits. If we were to vacate only one, we would never know which one to choose.

*Id.* at 328-30 (citations, quotations and brackets omitted).

■ In this case, the jury's verdict of not guilty of negligent homicide by operating a boat while under the influence of intoxicating liquor, meant that the jury unanimously agreed that the defendant was not guilty of that charge. Even assuming that the two verdicts are inconsistent, we cannot infer that the acquittal stemmed either from jury error, leniency, nullification, insufficiency of the evidence, or any other particular reason. We thus conclude that the acquittal on indictment #03-S-007 does not require us to reverse the defendant's conviction. *See id.*

■ Our jurisprudence also makes clear that the jury was free to consider all of the evidence, including that of the defendant's intoxication, in its deliberation on the charge that he negligently caused the death of another by failing to keep a proper lookout while operating a boat. In *State v. Ebinger*, the defendant was driving his truck when it struck and killed a fifteen-year-old bicyclist, who had been riding in the breakdown lane. The defendant was charged in a two-count indictment for negligent homicide, pursuant to RSA 630:3. The first count alleged that he was driving while under the influence of alcohol and caused the death of another; the second count alleged that he negligently crossed over the white fog line into the breakdown lane, thereby causing the death of another. *See Ebinger*, 135 N.H. at 265.

The jury convicted the defendant on the second count, but was unable to reach a decision on the intoxication count. The defendant appealed on the grounds of sufficiency of the evidence. We affirmed the conviction and

stated that in finding that the defendant failed to become aware of a substantial and unjustifiable risk that death would result from his conduct,

> the jury could have found that a reasonable person, in the defendant's place, would have seen [the victim] and avoided hitting her. Furthermore, the jury could have combined this finding with the evidence that the defendant had been drinking on the day of the accident to conclude that the defendant's failure to become aware of the risk constituted a gross deviation from the conduct that a reasonable person would observe in the situation.

*Id.* at 265-66 (quotation and brackets omitted). We concluded:

> The jury's failure to reach a verdict on the first count indicates that one or more of the jurors may have considered the evidence of the defendant's intoxication insufficient to establish his guilt beyond a reasonable doubt. The jury's inability to convict the defendant on the first count, however, did not preclude it from factoring evidence of alcoholic consumption into its conclusion that the defendant was criminally negligent. As the defendant acknowledged ... , the jury was properly permitted to consider the defendant's alcoholic intake and its effect upon his behavior.

*Id.* at 266-67.

In *State v. Pittera*, the defendant was operating his motorboat on Lower Suncook Lake when the boat and its propeller struck and killed a young boy who was swimming in the lake. The defendant was charged in two indictments, pursuant to RSA 630:3, alleging alternative theories for negligent homicide. The first indictment alleged negligence, based upon operating a boat at excessive speed and excessively close to shore; the second indictment alleged that he failed to pay due attention and failed to see a person in the water while operating the boat, thereby causing the death of another. The jury acquitted the defendant on the first indictment, but convicted him on the second. The defendant appealed his conviction, arguing insufficiency of the evidence. *See Pittera*, 139 N.H. at 259-60.

We affirmed the conviction and stated that in finding the defendant failed to become aware of a substantial and unjustifiable risk that death would result from his conduct, the jury

> could have found that a reasonable person, in the defendant's place, would have seen [the victim] in the water and avoided hitting him. Furthermore, the jury could have combined this finding with the evidence that the defendant was traveling

rapidly through a cove area containing numerous docks and adjacent to a known swimming area while watching the shoreline, to conclude that the defendant's failure to become aware of the risk constituted a gross deviation from the conduct that a reasonable person would observe in the situation.

. . . .

The acquittal of the defendant on the first count indicates that the evidence of the defendant's excessive speed alone was insufficient to establish his guilt beyond a reasonable doubt. The acquittal, however, did not preclude the jury from considering evidence regarding the defendant's speed in determining whether the defendant was criminally negligent under the second indictment.

*Id.* at 261 (citation, quotation and brackets omitted).

 Given all of the evidence in the instant case, the jury could have found that the defendant failed to become aware of a "substantial and unjustifiable risk" that death would result from his conduct, *see* RSA 626:2, II(d); that his failure constituted a "gross deviation from the conduct that a reasonable person would observe in the situation," *id.*; *see Ebinger*, 135 N.H. at 265; and that he was consequently guilty of negligent homicide for failure to keep a proper lookout while operating a boat. Further, we cannot say that no rational trier of fact could have found guilt beyond a reasonable doubt. Accordingly, we see no error in the trial court's denial of the defendant's motions to dismiss for insufficient evidence.

## VIII

Finally, the defendant contends that the trial court erred when it utilized flight as an aggravating factor in his sentencing. We again note that while introducing this argument in his brief, the defendant made passing reference to "due process" within the context of Part I, Article 15 of the New Hampshire Constitution and the Fourteenth Amendment to the United States Constitution. As these constitutional arguments were neither included in his notice of appeal or in the questions presented in his brief, nor developed in his brief, we decline to address them. *See, e.g., Shepard*, 144 N.H. at 264.

A trial judge has broad discretion to choose the sources and types of evidence upon which to rely in imposing sentence, and we review that sentencing decision under our unsustainable exercise of discretion standard. *State v. Lambert*, 147 N.H. 295, 295-96 (2001). An unsustainable exercise of discretion will occur if the trial judge fails to consider all the

relevant factors necessary to that exercise. *State v. Stone*, 122 N.H. 987, 989 (1982).

The trial judge included flight as one of the aggravating circumstances in his determination of the sentence, and sentenced the defendant to two and one-half to seven years in the State Prison. While acknowledging the broad discretion of the trial court to determine the duration of a sentence, the defendant contends it was error for the trial court to consider flight because a "review of the record clearly demonstrates that the defendant complied with the requirements of RSA 270:1-a and did not flee." We disagree.

■■■ We have previously detailed that the State presented significant evidence indicating that the collision of the two boats was not minor, that the defendant must have been aware that he had collided with another vessel, that the individuals on that other vessel required assistance, and that the defendant attempted to avoid detection. We have already held that the trial court did not err in giving the jury a flight instruction, as this evidence could support a determination that the defendant had fled. The trial judge could also rely upon this evidence in imposing the sentence. *See Lambert*, 147 N.H. at 295-96.

In addition, and in explaining the reasons for the sentence, the trial judge stated, in part:

> But I also have to consider the aggravating factors, and that's the nature of the crime, which is . . . criminal negligence, a gross deviation from the conduct that a reasonable person would engage in under the same or similar circumstances. It's not an accident, not civil negligence, and in that sense . . . I don't want to indicate by my sentence I'm not agreeing with your counsel or even your own testimony with respect to leaving the scene. I agree with your counsel that that's not a separate crime . . . . You're not being punished for that separately, but that's certainly an aggravating factor. I have to consider that an aggravating factor.
>
> . . . .
>
> Even if I assume and accept your testimony . . . that you did not hear the cries for help after you had powered down on a quiet night on Lake Winnipesaukee. . . . Kevin Hartman's first instinct. . . was to go over to the other boat . . . .
>
> Your instinct was not that. There was no going over to the other boat to assume everyone was okay. There was no picking up the cell phone and saying I was just involved in a collision with another boat. I want to make sure everything is okay or there's

nothing—there was nothing until the next day, and I do consider that an aggravating factor. I have to consider it. . . . [U]nder all those circumstances, given the death of Mr. Hartman, given the serious nature of the accident, given the fact that—of your conduct occurring and immediately after the accident . . . I think in the totality of the circumstances a State Prison sentence is warranted.

A review of the trial judge's complete remarks reveals that he properly considered the traditional goals of sentencing—punishment, deterrence, and rehabilitation—in crafting the sentence. *See State v. Hammond*, 144 N.H. 401, 408 (1999). The trial judge clearly considered the defendant's life history, his lack of any criminal record, his demeanor throughout the length of the trial, and the tremendous impact of the trial and sentence on both the defendant and his family, as relevant mitigating factors in his determination of the sentence. *See State v. Stearns*, 130 N.H. 475, 493 (1988) (no abuse of discretion where, among other things, trial court considered defendant's age, health needs, and lack of prior criminal involvement in determining sentence). As the trial court could rely upon the evidence of flight in imposing the sentence, and as it considered all of the relevant factors in determining the sentence, we find no error in its sentencing order. *See Hammond*, 144 N.H. at 408.

*Affirmed.*

NADEAU, DALIANIS, DUGGAN and GALWAY, JJ., concurred.