Hillsborough-northern judicial district
No. 2009-892

### THE STATE OF NEW HAMPSHIRE

v.

### TODD PETERS

Argued: April 13, 2011
Opinion Issued: May 12, 2011

*Michael A. Delaney*, attorney general (*Thomas E. Bocian*, assistant attorney general, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

DALIANIS, C.J. The defendant, Todd Peters, appeals his convictions on two counts of first-degree murder following a jury trial in Superior Court (*Abramson*, J.). *See* RSA 630:1-a, I(a) (2007). On appeal, he argues that the Trial Court (*O'Neill*, J.) erred when it denied his motions *in limine* to introduce evidence of alternative perpetrators and to exclude the testimony of the keeper of the records for Cellco Partnership d/b/a Verizon Wireless. We affirm because we conclude that even if the trial court erred in these respects, the State has met its burden of proving that these errors were harmless beyond a reasonable doubt.

*I. Background*

*A. Murders*

The jury could have found the following facts. The victims were Edith Riley and Timothy King, who lived together with their children on Valley Street in Manchester, approximately one block from Annemarie Peters, the defendant's ex-wife and the mother of his then eleven-year-old son. Riley's then twelve-year-old daughter knew the defendant and his son from a local football league in which the son played and for which she was a cheerleader.

The victims were murdered in the early morning of October 11, 2008. On the night before the murders, the defendant had been drinking enough alcohol that he was "probably drunk" and had been arguing with his girlfriend, Delane Demers, with whom he lived in Weare. Their argument escalated, and the police were called. Although the police determined that no crime had occurred, they separated the two; Delane remained in the couple's apartment, and the police drove the defendant to Concord.

Delane's brother, Dwayne, arrived just as the police were escorting the defendant from the apartment. Dwayne remained with Delane until the defendant returned, approximately two or three hours later. Soon after returning to Weare, the defendant, along with Dwayne, drove in Delane's SUV to Annemarie's Manchester apartment. When they arrived, the defendant went to his son's room, woke him up, and asked him why he quit the football team. His son explained and then told the defendant about

problems he was having in the neighborhood with the victims and with Jennifer Tardiff, the victims' neighbor. The defendant's son told him that the victims were threatening him and that King threw a rock, which hit him in the leg. He also said that earlier that day, as Tardiff and Riley drove by, Tardiff threw a water bottle at one of the defendant's son's friends, leaving a red mark on his face. The defendant's son and his friends went inside the victims' and Tardiff's apartment building but left when Tardiff came outside with a metal pole, screaming. A friend, who was sleeping over, confirmed the defendant's son's account of the encounters with the victims and Tardiff.

When the defendant emerged from his son's room, he appeared "visibly angry." Armed with a baseball bat, he went to the victims' apartment where the victims were asleep on their sofa. Shortly thereafter, Riley's daughter woke up to Riley's screams. She got out of bed and, when she reached the kitchen, saw a white man in his mid-thirties, whom she recognized as the defendant, walking out of the living room, carrying a bat. Riley's daughter later identified the defendant in a photo array containing six photographs, telling the police that she was "sure" that the photograph was of the man whom she saw in her apartment on the morning of the murders.

The defendant walked past Riley's daughter and exited the apartment, still holding the bat. Riley's daughter found both bloodied victims in the living room and called 911. The police arrived about one minute later, at approximately four o'clock in the morning.

When they interviewed her at the scene, Riley's daughter told the police that she had been asleep and had been awakened by the sound of her mother screaming very loudly. She immediately jumped out of bed, walked out of her bedroom, and saw the defendant standing "where the living room meets the kitchen," holding a baseball bat. She gave a detailed description of the man's appearance and then said that she was "seventy-five percent sure" that he was the defendant, whom she knew from cheerleading practice.

Meanwhile, when Dwayne realized that the defendant had left Annemarie's apartment, he went outside to look for him. As Dwayne made his way toward a nearby alley, the defendant came running out of it and told Dwayne "to run and get the F out of there." They ran to Delane's SUV, which the defendant had parked in front of Annemarie's apartment. The defendant started the SUV and said, "I think I just killed someone." He explained, "[T]here was a guy and a girl, and I think one of them's dead." Dwayne looked in the back seat and saw a baseball bat on the seat. With "a white-knuckled grip on the steering wheel," the defendant then drove off.

The defendant first drove to an ex-girlfriend's apartment in Manchester, but soon drove back past the victims' apartment where rescue personnel

and police vehicles had arrived. The defendant next drove to Weare, past the apartment he shared with Delane. Seeing her SUV pass by and thinking that it had been stolen, Delane called the police.

The defendant then drove the SUV past his Weare apartment again, turned onto a paved road near Drew Pond and parked in front of the pond. Dwayne exited the vehicle while the defendant "took off walking to the rear of the vehicle." When Dwayne returned to the SUV, he noticed that the bat had been removed.

When the defendant returned to the SUV, he drove to a Walgreen Drug Store in Concord. The defendant parked the vehicle, Dwayne exited again, and when he returned, the defendant was in the driver's seat. The defendant said that he could not drive anymore and "just . . . needed to sit there." Dwayne offered to drive, and the two switched places; Dwayne drove back to the defendant's Weare apartment.

The videotape from a surveillance camera in the Walgreen parking lot confirmed Dwayne's account. The video shows a four-door SUV with two occupants driving into the parking lot at approximately 5:13 a.m. After the vehicle parked, one of the occupants exited for a short period of time. When this person returned, the two occupants switched places, and the SUV left the parking lot.

When Dwayne and the defendant arrived at the defendant's apartment, Dwayne saw his sister, Delane, outside on the balcony. She and the defendant exchanged words about him taking her SUV, at which point Dwayne left for home, and the defendant walked into the apartment. A few minutes later, the police arrived at the defendant's apartment, responding to Delane's earlier call about her stolen SUV. They asked Delane to speak to them outside, and then asked to enter the apartment. Once inside, the police searched for the defendant, but could not find him. As they searched, Delane received a text message from the defendant saying, "I will be at the dam until [the] shit clears out." Delane showed the message to the police, and, at their request, called the defendant to tell him that he was not under arrest and that the police wanted to speak with him. The defendant sent a text message in reply, "Don't BS me." Eventually, the defendant returned to the apartment and was arrested.

After his arrest, the defendant telephoned Delane and told her that Dwayne had picked him up in Concord on the evening of October 10 and was with him during the early morning hours of October 11, and that he was never in Manchester during those hours. A couple of weeks later, he called his son and father. The defendant told his son that he was not in Manchester when the murders occurred. The defendant's conversation with his son was, in part, as follows:

[Defendant]: Ok. I am sorry I am here buddy but I didn't do this, okay?

[Son]: Yep.

[Defendant]: All right? I didn't do this.

[Son]: I know.

[Defendant]: I wasn't even there that night.

[Son]: Oh-I seen you leave.

[Defendant]: Huh?

[Son]: I said I seen you leave.

[Defendant]: No you didn't.

[Son]: That's when I, I woke up — when you left.

[Defendant]: No you didn't. You didn't see me buddy, ok?

[Son]: I know that.

[Defendant]: Alright I love you.

[Son]: I love you too.

When the defendant spoke with his father, he denied this conversation took place.

On October 11, as part of their investigation of the murders, the police spoke to Dwayne, who told them about the bat. Although the police were unable to find the bat in Drew Pond when they first looked for it, a fish and game conservation officer saw it floating in the pond four days later. The officer contacted the police, who retrieved it.

Autopsies performed on the victims' bodies confirmed that their deaths were homicides by blunt injuries to the head that resulted in fractures of the skull and injuries to the brain. The medical examiner who conducted the autopsy of King's body testified that it "would [have] take[n] a lot of force" to cause the extent of his injuries. The medical examiner who conducted the autopsy of Riley's body testified that the force used to cause her injuries "was enough to tear the skin and lift off a flap off the surface of the skull." The medical examiners testified that the injuries were consistent with being struck by a baseball bat.

### B. Motions in Limine

Before trial, the defendant moved *in limine* to introduce evidence related to aggressive, hostile or illegal behavior involving the victims and various neighbors. For instance, the defendant sought to introduce evidence that approximately two months before the murders, King "was in a fight with Victor Archibault over $5.00," and that approximately one month

before the murders, he fought with "Paul Frederick," spreading a rumor that Frederick was a pedophile. The defendant also sought to introduce evidence about incidents that occurred closer in time to the murders, such as that on the day before the murders, Annemarie tried to run Riley off the road and later said, "You'll get yours, wait till tonight." The defendant argued: "Evidence that the victims engaged in a pattern of violent, threatening and illegal behavior towards other persons supports the defense because it makes it likely that another person was provoked to kill them." The State contended that the evidence was inadmissible because it did not directly connect any of the other alleged perpetrators to the victims' murders. *See generally* McCord, *"But Perry Mason Made It Look So Easy!": The Admissibility Of Evidence Offered By A Criminal Defendant to Suggest That Someone Else Is Guilty*, 63 TENN. L. REV. 917 (1995-1996).

The trial court ruled that the evidence was inadmissible to show that other people had a motive to kill the victims, but that the defendant could use some of the evidence to cross-examine witnesses about their biases and motives to lie. The evidence was not admitted at trial, however, because the State did not call any of the people whom the defendant alleged were possible perpetrators and, thus, did not give the defense an opportunity to use the evidence to impeach.

The defendant also moved *in limine* to exclude the testimony of the keeper of the records for Cellco Partnership d/b/a Verizon Wireless. The State indicated that it intended to call this witness to testify about "call detail records" relating to phone calls allegedly made from the defendant's and Dwayne's cell phones. The State contended that the call detail records showed that the defendant placed a call at 3:35 a.m., approximately twenty minutes before the murders, and that the call was transmitted by way of a cell phone tower located at 650 Elm Street in Manchester, approximately one-half mile from the homicide scene.

The defendant argued that the call detail records were scientific in nature and admissible only through expert witness testimony. *See Wilder v. State*, 991 A.2d 172, 198 (Md. Ct. Spec. App.), *cert. denied*, 415 Md. 43 (2010). He also argued that the records should be excluded as unreliable because the technology upon which they are based does not meet the *Daubert* standard of reliability. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Baker Valley Lumber v. Ingersoll-Rand*, 148 N.H. 609, 614 (2002) (adopting *Daubert* standard).

The State countered that the keeper of the records need not be an expert, but could offer lay testimony about the cell phone detail records. *See Perez v. State*, 980 So. 2d 1126, 1130-32 (Fla. Dist. Ct. App. 2008). The State further contended that the *Daubert* standard did not apply to the cell

phone detail records themselves. *See State v. Robinson*, 724 N.W.2d 35, 68-69 (Neb. 2006), *abrogated on other grounds by State v. Thorpe*, 783 N.W.2d 749 (Neb. 2010).

The trial court ruled that the cell phone records were admissible under the business records exception set forth in New Hampshire Rule of Evidence 803(6). The trial court further ruled that expert witness testimony was not required and that a *Daubert* hearing was unnecessary. At trial, the call detail records were received into evidence, and the keeper of the cell phone records testified that an outgoing call was placed from the defendant's cell phone at 3:35 a.m. on October 11 and that the call connected through a tower located at 650 Elm Street in Manchester.

The jury convicted the defendant on two first-degree murder charges. This appeal followed.

## II. Harmless Error

The defendant argues that the trial court erred when it barred him from presenting evidence that would have substantiated his claim that someone else killed the victims and when it allowed the State to introduce the call detail records and testimony of the keeper of those records. The State counters that even if the trial court erred in these respects, any error was harmless. Assuming, *arguendo*, that the trial court erred by excluding the other perpetrator evidence and admitting the cell phone evidence, after reviewing the record, we conclude that the State has satisfied its burden of proving that these errors were harmless beyond a reasonable doubt.

To establish that an error was harmless, the State must prove beyond a reasonable doubt that the error did not affect the verdict. *State v. Etienne*, 146 N.H. 115, 118 (2001). This standard applies to both the erroneous admission and exclusion of evidence. *See id.* (excluding evidence); *State v. Gordon*, 161 N.H. 410, 416-17 (2011) (admitting evidence). An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight, and if the evidence that was improperly admitted or excluded is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. *See Gordon*, 161 N.H. at 416-17. In making this determination, we consider the alternative evidence presented at trial as well as the character of the erroneously admitted or excluded evidence itself. *See id.* at 416.

For the jury to convict the defendant of the first-degree murder charges, the State had to prove, beyond a reasonable doubt, that he purposely caused the victims' deaths. *See* RSA 630:1-a, I(a), II (2007). The alternative evidence of the defendant's guilt included the testimony of four

witnesses (Dwayne, the defendant's son and his friend, and another person at Annemarie's apartment) that the defendant was in Manchester, approximately one block from the murders, near the time of the murders.

It also included the testimony of Riley's daughter that she was "a hundred percent" sure that the defendant was in the victims' apartment immediately after the murders were committed. Riley's daughter testified that on the night of the murders, she saw the defendant, holding a bat while he walked out of the living room where the victims lay covered in blood. She immediately recognized the defendant because she knew him from cheerleading practice. She identified him again in a photographic array and in court.

The alternative evidence also included testimony that the defendant had a motive for killing the victims. Shortly before the murders took place, the defendant's son told him that King had pelted him with a rock and Tardiff had hit his friend in the face with a water bottle. Upon hearing this, the defendant left his son's room looking "agitated," "upset," and "visibly angry." He then left Annemarie's apartment.

The alternative evidence also included the defendant's confession. Shortly after the defendant was seen in the victims' apartment, Dwayne saw him running from the apartment's direction and heard him yell, "run and get the F out of here." The defendant then confessed: "I think I just killed someone. . . . [T]here was a guy and a girl, and I think one of them's dead."

Further, the alternative evidence included evidence linking the defendant to the murder weapon. Riley's daughter saw the defendant in the victims' apartment holding a silver and black baseball bat. Shortly after the murders were committed, Dwyane saw an aluminum bat in the backseat of Delane's SUV. When they arrived at Drew Pond, Dwayne exited the vehicle while the defendant "took off walking to the rear of the vehicle." When Dwayne returned to the vehicle, he noticed that the bat was no longer there. An aluminum bat was discovered floating in the pond approximately four days later.

█ Finally, the alternative evidence included evidence showing that the defendant was conscious of his guilt. For several hours after the murders, he and Dwayne drove to Manchester, Weare, Concord, and then back to Weare, where the defendant was eventually arrested, after having hidden from the police at a dam near his apartment. *See State v. Littlefield*, 152 N.H. 331, 335 (2005) (consciousness of guilt may be evidenced by flight). After he was arrested, the defendant telephoned his girlfriend and his son, insisting to both that he was not in Manchester on the night of the murders. *See State v. Evans*, 150 N.H. 416, 420 (2003) (consciousness of guilt may be

evidenced by exculpatory statements later discovered to be false). He told his son, in response to the son's statement that he had seen the defendant the night of the murders: "No you didn't. You didn't see me buddy, ok?" *See Nguyen v. State*, 543 S.E.2d 5, 12 (Ga. 2001) (defendant's attempt to influence witness is evidence of consciousness of guilt).

■ Against this evidence, the cell phone evidence was merely cumulative. Even if it had not been admitted, there was ample evidence that the defendant was at or near the crime scene around the time of the murders. In addition, compared to the evidence of the defendant's motive and opportunity to commit the murders, the alternative perpetrator evidence the defendant proferred in his motion *in limine* was inconsequential. Whereas there was evidence that the defendant was at the crime scene around the time of the murders, confessed to killing at least one person, and was seen with the murder weapon, there was no such evidence about any of the alleged alternative perpetrators. In fact, one of the alleged perpetrators was elsewhere in Manchester when the murders occurred. Another was in her apartment with others when the murders were committed. Based upon our review of the record, we conclude that the State has met its burden of proving that any error was harmless beyond a reasonable doubt.

*Affirmed.*

DUGGAN, HICKS, CONBOY and LYNN, JJ., concurred.