**THE STATE OF NEW HAMPSHIRE**

**SUPREME COURT**

**In Case No. 2015-0271, <u>State of New Hampshire v. James Robarge</u>, the court on July 28, 2017, issued the following order:**

Having considered the briefs and oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in this case.  The defendant, James Robarge, appeals his conviction following a jury trial in Superior Court (<u>Tucker</u>, J.) for reckless second degree murder, <u>see</u> RSA 630:1-b, I(b) (2016).  On appeal, he argues that the trial court erred by admitting:  (1) location evidence derived from cellular telephone records; (2) a photograph of his torso depicting a tattoo that says "LOVE Kills Slowly"; and (3) testimony that, approximately one or two years before the victim was killed, the defendant threatened to kill her because her hair was too short.  We affirm because we conclude that, even if the trial court erred in those respects, the State has met its burden of proving that these errors were harmless beyond a reasonable doubt.

I

The jury could have found, or the record establishes, the following facts.  The victim was the defendant's wife.  The defendant and the victim began dating when they were approximately 12 years old.  They married in the early 1990's, when they were approximately 22 years old.

The defendant and the victim had a volatile relationship.  In 2012, the victim told her primary care provider that her relationship with the defendant was "abusive," but that she was not yet ready to leave him.  In the spring of 2013, she told her provider that she was separating from the defendant, that she was worried "about what [he] might do when he became angry," and that they had recently gotten into a "pushing contest."

The couple's adult daughters testified that their parents frequently fought and that their fights sometimes became physical.  One daughter testified that she heard the defendant say, on occasion, that if he could not have the victim, "nobody can."  That daughter also testified that she once saw the defendant "shove[ ]" the victim "into [a] wall."

The defendant and the victim separated in approximately April 2013. While separated, the victim lived at the marital home with one of the couple's daughters and the defendant stayed with his father in Vermont.  The defendant

frequently came to the marital home to drop off his dog and to do work around the house. The victim often communicated with the defendant by leaving him notes.

On June 26, 2013, the victim left the following note:

Jim, I have a proposal for you. I want a divorce, and this is what I'm offering so we don't have to go to court. This way we can just sign papers. Everything can still stay here, you can still come here to get and use your stuff. [The dog] is always welcome in and out. It's a piece of paper that changes the same piece of paper that got us here.

I still love you, always will. I do miss you, but I can't live with the drinking and pot anymore. The anger is too much for me. I still want you in my life if you want to be.

The note included a proposal for dividing the parties' property. The defendant put the note in a lockbox he kept at his father's Vermont property. Also in June 2013, he told a friend about his separation from the victim and said that the victim had "kicked him out and he wanted to kill her."

On the morning of June 27, 2013, the victim saw her primary care provider and told her that she planned to file for divorce later that day. The victim traveled from her provider's office to the circuit court in Claremont, where she filed for divorce at approximately 10:44 a.m. While at the courthouse, she sent electronic messages to her friends, Lori Laird and Richard Wayne Lucius, Jr. about having filed for divorce.

At approximately 11:00 a.m., she texted Laird and messaged Lucius through Facebook that she had arrived at her home in Charlestown and that the defendant was there. The victim texted Laird that the defendant did not know yet that she had filed divorce papers, but that she was "going to tell him." Laird did not hear from the victim again. At approximately 1:30 p.m., the victim's neighbor heard a man and a woman yelling at each other at the victim's property. The neighbor described the yelling as "arguing" and said that it continued for the entire 10 minutes that he was outside.

At approximately 2:45 p.m., the defendant texted one of the couple's adult daughters, asking whether she knew the victim's whereabouts. The daughter arrived at the victim's home at approximately 3:45 p.m. She saw the defendant sitting on the porch with her toddler nephew, the victim's and the defendant's grandson. The victim's car was still at the home, along with her purse and car keys. The victim regularly cared for her grandson, and at trial, her family agreed that she would not have left him alone.

2

While the daughter was still at the victim's home, the defendant departed in his car, saying that he was going to look for the victim. The daughter contacted the victim's family and friends, and one of them contacted the police. The daughter noticed that the railing of the staircase banister and a light fixture were broken and testified that neither had been broken when she left for work that morning. When the daughter's grandmother and great-grandmother arrived, the daughter went into the bathroom and discovered that the toilet was "drenched" in blood. When the victim's and the defendant's other daughter arrived at the home, she smelled a "cleaning product."

At approximately 5:50 p.m., which was after the police had arrived, the defendant called one of his daughters and told her that his car had "broke[n] down" near Unity. Soon thereafter, a Claremont police officer saw the defendant walking on Second New Hampshire Turnpike. The officer stopped the defendant and identified him. A State trooper arrived soon thereafter. Both the police officer and the trooper smelled alcohol on the defendant's breath. The trooper described the defendant as "very nervous"; the trooper noticed that the defendant's eyes were "bloodshot and glossy."

Both the police officer and the trooper noticed that the defendant had scratches on his body and hands. The police officer testified that the scratches "looked red and appeared fresh." The trooper testified that one scratch, in particular, "was very aggravated and inflamed looking." The trooper also testified that he saw "a significant amount of blood" on the inner right side of one of the defendant's sneakers and "fresh" blood on the defendant's shorts.

The defendant told the police that his car "had broken down further up the road." The defendant did not tell the police that he was out looking for his wife. The trooper testified that the defendant "didn't really have much to say."

After locating the car, the trooper peered inside and saw that the driver's seat "appeared very wet" and that there was a green t-shirt on the rear seat that was "soaking wet." The trooper smelled "a very strong odor of burnt motor oil emanating from the vehicle."

The defendant agreed to be interviewed at the Claremont Police Department. While there, he appeared to be "very nervous and fidgety." The trooper noticed that "all the knuckles" on the defendant's right hand were "swollen and red." The trooper also observed that, after the defendant used the restroom and was heard "trying to clean something," the blood that previously had been on the inside sole of his right sneaker was gone. The trooper saw more blood, however, on the back of both of the defendant's sneakers.

In his police interview on June 27, the defendant said that he last saw the victim the day before when he installed a door at the marital home. He told the police that he had no idea where the victim was and that he had returned to the home on the afternoon of June 27 to find his grandson alone and two

3

dogs fighting. The defendant said that, although he and the victim lived separately, he did not believe that divorce was "on the horizon"; he said that the victim had told him "a month ago" that she "was gonna file paperwork," but that he had not yet been served with that paperwork.

After the defendant was interviewed, upon being told that he was no longer free to leave, he ran across the street and into a corner. A trooper chased and caught the defendant and brought him back to the police station, where he was arrested.

The defendant was interviewed again on July 2. In that interview, he admitted that he had received the note that the victim had left for him on June 26.

On July 6, the victim's badly decomposed body was found in a heavily wooded area, near a drivable trail off Britton Road in Unity, approximately two miles from where the defendant's car had broken down. Subsequent testing revealed that blood on the defendant's shorts, sock, and sneakers contained the victim's DNA. As to some of the blood stains, the State's bloodstain pattern analysis expert concluded that the defendant had been present when the victim's blood was shed due to "[b]lunt force trauma." The expert testified that blunt force trauma includes "beatings, blood being impacted by a fist, or a flap, or an elbow, or even a kick."

The victim's DNA was also found in bloodstains in the area of the front door and in the bathroom of the marital home. Analysis of the blood stains in the home's foyer indicated that the victim had been struck there at least three times. Areas in the bathroom appeared to have been cleaned recently.

Approximately 36 feet from the defendant's car, the police found a mat that fit into the car's trunk. The mat tested positive for blood and contained the victim's DNA. To the right of the mat, police found a green blanket, a light-colored towel, and speaker wire, all of which tested positive for blood and contained the victim's DNA. In addition, the victim's DNA was found in a bloodstain on a toolbox in the trunk of the defendant's car.

The victim's daughters identified the green blanket as having come from the marital home. One daughter testified that, because the latch to the trunk of the defendant's car was broken, speaker wire was used to secure the trunk from inside the passenger compartment. Laboratory testing revealed that speaker wire inside the trunk of the defendant's car had been attached to the wire found outside with the trunk mat.

Testing of the defendant's car revealed that it had no oil and that its oil pan had a hole in it. Near where the victim's body had been located, searchers found a dark streak of "what looked" and "smelled like oil." The oil streak began at a rock near a pothole. Also found near the streak and on the rock

4

were metal fragments, which later testing revealed came from the hole in the oil pan of the defendant's car.

The defendant was indicted on alternative counts of first and second degree murder. The first degree murder indictment alleged that the defendant "purposely cause[d] the death of [the victim] by inflicting trauma to her body." The second degree murder indictment alleged that he "recklessly cause[d]" the victim's death "by inflicting trauma to her body under circumstances manifesting an extreme indifference to the value of human life."

II

Before trial, the defendant moved to preclude or limit testimony from two detectives regarding their analysis of the possible locations of the cellular telephones belonging to the victim and to the defendant on and before June 27, 2013. According to the State, the detectives used cellular telephone records, which showed the towers and sector to which a cellular telephone connected at the beginning and at the end of each call, and used the geographic locations of the towers and their sectors to plot on a map the location of the tower and the direction and width of the sector to which a cellular telephone connected for each call. The defendant argued that the evidence should be precluded or limited because it did not meet the Daubert standard for admissibility. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Baker Valley Lumber v. Ingersoll-Rand, 148 N.H. 609, 614 (2002) (adopting Daubert standard); see also RSA 516:29-a (2007) (codifying the Daubert standards). Following an evidentiary hearing, the trial court denied the defendant's motion.

In another pretrial motion, the defendant sought to preclude evidence of his tattoos as shown in photographs of his purported injuries. At issue, in particular, was a photograph of a tattoo that reads, "LOVE Kills Slowly." The trial court observed that "[a] scratch mark cited by the State as evidence of injury goes directly through the tattoo." Based upon its view of the photograph, the court determined that the probative value of showing the injury was not "substantially outweighed by any unfair prejudice that may accompany the jury's view of the tattoo." The court invited the defendant to request a limiting instruction.

For its part, the State filed a pretrial motion to admit evidence that, "a year or two" before the victim was murdered, the defendant was heard telling the victim "that he was going to kill [her] because her hair had been cut too short." The State argued that the threat "demonstrates the defendant's intent and pre-meditation to kill [the victim]," and also made it "more likely that he was motivated to kill [the victim] because she wanted to divorce him." The defendant objected, asserting that "there is no logical connection between the purported threat over a haircut and the charges" in this case and that "the purported threat was over a year ago." The trial court granted the State's motion, ruling that the defendant "expressing an intent to kill" in a case "where

[he] is charged with murder is relevant," and that the threat was not "too remote" in time to be admissible.

Following an 18-day trial, the jury acquitted the defendant of first degree murder and of the lesser-included charge of knowing second degree murder, but convicted him of reckless second degree murder.

III

On appeal, the defendant argues that the trial court erred by admitting: (1) the location evidence derived from the cellular telephone records; (2) the photograph of his torso depicting the tattoo saying "LOVE Kills Slowly"; and (3) evidence that, approximately one or two years before the victim was killed, the defendant threatened to kill her because her hair was too short. For the purposes of this appeal, we need not decide whether these claims are meritorious because, even if the trial court erred, we affirm the defendant's conviction because we hold that the errors, if any, were harmless beyond a reasonable doubt.

To establish that an error was harmless, the State must prove, beyond a reasonable doubt, that the error did not affect the verdict. State v. Peters, 162 N.H. 30, 36 (2011). An error may be harmless beyond a reasonable doubt if the other evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight, and if the evidence that was improperly admitted or excluded is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. Id. In making this determination, we consider the other evidence presented at trial as well as the character of the erroneously admitted or excluded evidence itself. Id.

To convict the defendant of the applicable variant of second degree murder, the State had to prove beyond a reasonable doubt that he caused the death of another "recklessly under circumstances manifesting an extreme indifference to the value of human life." RSA 630:1-b, I(b). "A person acts recklessly with respect to a material element of an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." RSA 626:2, II(c) (2016). "The risk must be of such a nature and degree that, considering the circumstances known to him, its disregard constitutes a gross deviation from the conduct that a law-abiding person would observe in the situation." Id.

Here, the other evidence of the defendant's guilt was overwhelming. It included evidence of his motive to kill the victim. There was evidence that the defendant and the victim had a long-term and physically abusive relationship, and that the day before she was killed, the victim had left a note for the defendant telling him that she wanted a divorce and proposing a property settlement. There was also evidence that she filed for divorce on June 27, the last day on which she was seen alive, and that, according to her last texts, the

6

victim was waiting inside the marital home to tell the defendant that she had filed for divorce. The evidence included testimony from the defendant's friend that, because he was separated from the victim, the defendant wanted to kill her.

The other evidence of the defendant's guilt also included evidence that he and the victim had a physical fight on June 27. Her blood was found in numerous locations in the marital home. Her blood was also found on the defendant's clothes, sock, and sneakers. There was evidence that the defendant's torso had fresh scratches on it and that the knuckles of his right hand were swollen and red. Additionally, there was evidence that the defendant was present when the victim suffered blunt force trauma.

The other evidence of the defendant's guilt also included evidence that the victim's bloody body had been in his car. Her blood was found on the mat that came from the trunk of the defendant's car. It was also found on a green blanket, light-colored towel, and speaker wire, all items that were found near the trunk mat.

The other evidence of the defendant's guilt also included evidence that he deposited the victim's body in the woods. Metal fragments from his car's oil pan were found along the trail that led to her body.

The other evidence of the defendant's guilt showed that he was conscious of his guilt. There was evidence that, as soon as he was told that he was no longer free to leave the police station, the defendant fled. See State v. Littlefield, 152 N.H. 331, 335 (2005) (consciousness of guilt may be evidenced by flight). There was also evidence that, when he texted his daughter on June 27 asking about the victim's whereabouts, the defendant knew where the victim was because he had killed her and had deposited her body in the woods. There was evidence that he lied to the police in his initial interview by telling them that he did not believe that divorce was imminent, even though he had received the victim's June 26 note telling him that she wanted a divorce. See State v. Evans, 150 N.H. 416, 420 (2003) (consciousness of guilt may be evidenced by exculpatory statements later discovered to be false). Additionally, there was evidence that the defendant attempted to clean up the bathroom in the marital home after the murder and that he attempted to scrub the victim's blood off his sneakers. See State v. Edic, 169 N.H. 580, 590 (2017) (evidence that the defendant flushed the towel he used to clean up the victim's blood down toilet constituted evidence that he was conscious of his guilt).

Against this evidence, the location evidence derived from cellular telephone records was cumulative. Even if it had not been admitted, there was ample other evidence establishing the whereabouts of the victim and of the defendant on June 27. For instance, the testimony of the court clerk who waited on the victim that day, the testimony about the victim's text messages that day, and evidence that her car, purse, and car keys were at the marital

7

home that afternoon, established that the victim traveled from the court house to the marital home on June 27.

The victim's text messages and the testimony of the neighbor who heard a man and woman fighting, as well as all of the evidence linking the defendant to the victim's murder, established that the defendant and the victim were together at the marital home on June 27. The metal fragments, which testing revealed came from a hole in the oil pan of the defendant's car, and which were found on the trail near where the victim's body was found, constituted other evidence that the defendant was in that location. We, thus, conclude that the location evidence derived from the cellular telephone records was "merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt." Peters, 162 N.H. at 36.

We similarly find inconsequential and/or cumulative evidence of the defendant's "LOVE Kills Slowly" tattoo and evidence that, approximately one or two years before she was killed, the defendant threatened to kill her because her hair was too short. See id. Even without such evidence, the jury heard that the defendant was abusive toward the victim and that he had threatened her on other occasions. For instance, the victim's primary care provider testified that the victim had described her relationship with the defendant as "abusive" and had told her provider that she feared his anger and that the two had gotten into a "pushing contest" in the spring of 2013. The couple's daughters testified that the defendant and the victim frequently fought and that their fights were sometimes physical. One daughter testified that she once saw the defendant "shove[ ]" the victim into a wall. The jury also heard that, in mid-June 2013, the defendant told a friend about his separation from the victim and said that the victim had "kicked him out and he wanted to kill her." One daughter testified that she had heard the defendant say, on occasion, that if he could not have the victim, "nobody can."

For these reasons, we conclude that the State has met its burden of proving that any error in admitting the evidence the defendant sought to exclude was harmless beyond a reasonable doubt. Any issues that the defendant raised in his notice of appeal, but did not brief, are deemed waived. See State v. Cooper, 168 N.H. 161, 171 (2015).

Affirmed.

DALIANIS, C.J., and HICKS, LYNN, and BASSETT, JJ., concurred.

**Eileen Fox,
Clerk**

8