NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Grafton
No. 2017-0632

THE STATE OF NEW HAMPSHIRE

v.

TOMMY PAGE

Argued: November 28, 2018
Opinion Issued: March 19, 2019

Gordon J. MacDonald, attorney general (Peter Hinckley, senior assistant attorney general, on the brief and orally), for the State.

Thomas Barnard, senior assistant appellate defender, of Concord, on the brief and orally, for the defendant.

HICKS, J. The defendant, Tommy Page, appeals his convictions, following a jury trial in Superior Court (MacLeod, J.), of first degree murder, see RSA 630:1-a, I(b)(1) (2016), and falsification of physical evidence, see RSA 641:6, I (2016). We affirm.

The jury could have found the following facts. In the fall of 2015, the defendant met Danielle Sylvester, the mother of the victim. Sylvester was separated from the victim's father, and the two shared custody of the child. The defendant and Sylvester began a romantic relationship, and, soon thereafter, Sylvester moved in with the defendant and his mother.

On Wednesday, November 11, 2015, Sylvester picked up the 11-month-old victim from his father's house, and the victim stayed with her at the defendant's house until Friday, November 13. Sylvester had a scheduled medical appointment on Friday, and the defendant, who had "called out of work" that day, offered to watch the victim while Sylvester went to her appointment.

Sylvester left the house at approximately 12:30 p.m., leaving the victim alone with the defendant. The victim had no visible bruising, swelling, or injuries when Sylvester left him. She returned to the house at approximately 2:30 p.m. and, having been told by the defendant that the victim was in his crib sleeping, proceeded to put away some purchases. When Sylvester eventually checked on the victim, she found him lying in vomit in his crib. He did not respond when she spoke to him, and, when she picked him up, "he was completely dead weight."

Sylvester immediately told the defendant that they needed to take the victim to the hospital. As they were leaving the house to do so, the victim stopped breathing and Sylvester called 911. At this time, Sylvester noticed that the "whole side of [the victim's] face was bruised." The victim was taken by helicopter to Dartmouth Hitchcock Medical Center. He died two days later.

According to expert testimony at trial, the victim suffered "massive injury to his head and brain." His injuries included extensive bruising over his face, forehead, scalp, and ears, "fairly extensive fractures on both sides of his head," "severe tissue damage to his brain," a broken leg, a broken arm, and injuries to his penis, scrotum, and anus.

On November 14, 2015, the police obtained a warrant to search the defendant's cell phone. Forensic examination of that phone uncovered a number of photographs, 14 of which were published to the jury at trial. Those photographs were taken with the defendant's cell phone between 1:08 and 1:20 p.m. on November 13, 2015, and had been deleted from that phone. Some showed signs of injury to the victim's head and face. Others, according to the trial court's order on the defendant's motion to suppress, "depict[ed] the penis and anus of an infant male and several depict[ed] an adult male hand digitally penetrating the infant's anus."

At trial, the theory advanced by the defendant in opening and closing statements was that, although he sexually assaulted the victim, as evidenced in the photographs on his phone, he did not cause the victim's death. Rather, according to the defendant's theory, Sylvester returned from her medical appointment "already frustrated," discovered that the victim had urinated on her bed, and, in a "momentary, yet horrific loss of self control," fatally beat the victim.

The jury convicted the defendant of first degree murder and falsification of physical evidence.  He now appeals, arguing that the trial court erred by: (1) denying his motion to suppress photographs found on his cell phone; (2) denying his motion to admit, as substantive evidence, prior statements by the victim's mother that she did not want to be alone with the victim because she was having "bad thoughts"; and (3) failing to instruct the jury that to convict on the first degree murder charge, it had to find that the defendant was aware that his conduct was "practically certain" to cause the victim's death.

## I.  Suppression

We begin with the defendant's challenge to the trial court's suppression ruling.  Because the defendant raises claims under both the State and Federal Constitutions, we first address his claim under the State Constitution and rely upon federal law only to aid in our analysis.  State v. Ball, 124 N.H. 226, 231–33 (1983).  "Part I, article 19 of the New Hampshire Constitution provides that search warrants shall issue only upon 'cause or foundation,' supported by oath or affirmation," which we have interpreted "as a requirement for probable cause."  State v. Decoteau, 137 N.H. 106, 111 (1993).  We review the trial court's ruling on probable cause "de novo except with respect to any controlling factual findings."  State v. Ward, 163 N.H. 156, 159 (2012).  Nevertheless, "[w]e assign great deference to the magistrate's determination of probable cause, and do not invalidate a warrant by interpreting the evidence submitted in a hypertechnical sense."  State v. Zwicker, 151 N.H. 179, 185 (2004).  "We apply a totality-of-the-circumstances test to review the sufficiency of an affidavit submitted with a warrant application."  State v. Letoile, 166 N.H. 269, 273 (2014).  We interpret such supporting affidavits "realistically and with common sense," Zwicker, 151 N.H. at 186, and we "determine close cases by the preference to be accorded to warrants," Letoile, 166 N.H. at 273 (quotation omitted).

### A.  Probable Cause

The defendant first argues that the affidavit did not establish probable cause to search for photographs.  He does not "dispute that the affidavit established probable cause to search his phone for text messages that he and Sylvester exchanged after the victim's hospitalization."  He contends, however, that the affidavit, which did not mention photographs, "failed to show that it was 'probable' that photographs constituted the fruit, instrumentalities, or evidence of any crime."

"Probable cause exists if a person of ordinary caution would justifiably believe that what is sought will be found through the search and will aid in a particular apprehension or conviction."  Letoile, 166 N.H. at 272 (quotation omitted).  "The police must demonstrate in an application for a search warrant that there is a substantial likelihood that the items sought will be found in the

3

place to be searched." Id. at 272–73 (quotation omitted). "The affiant need not establish with certainty, or even beyond a reasonable doubt, that contraband or evidence of a crime will be found in a particular place." In re Search Warrant for 1832 Candia Road, 171 N.H. 53, 56 (2018). Our task as the reviewing court is to "examine whether, given all the circumstances set forth in the affidavit, the magistrate had a substantial basis for concluding that there was a fair probability that contraband or evidence of a crime would be found in the particular place described in the warrant." Id. at 56-57.

The warrant was supported by the affidavit of State Police Sergeant Sonia, who stated that it was based upon his "personal involvement in the investigation into the possible assault and sexual abuse of S.S., a minor, in Alexandria, New Hampshire, as well as discussions with other members of law enforcement in that investigation." The affidavit recounted, in part, that Sylvester was the victim's mother, that the defendant was her boyfriend, and that she and the defendant lived together. It stated that Sylvester called 911 "[a]t about 3:03 p.m. on November 13, 2015, . . . reporting in substance that her son, 11-month-old S.S . . . was in medical distress and that she needed immediate medical assistance." The affidavit detailed observations of the victim's condition by the responding emergency medical personnel and Sylvester's account of her, the victim's, and the defendant's whereabouts between November 11 and 13, as well as her observations of the victim's condition during that time. That account was substantially similar to the facts recited previously. The affidavit further recounted that "[a]ccording to Danielle Sylvester, after S.S. was rushed to the hospital, Tommy Page apologized, said in substance that 'I feel bad this happened while I was watching him' and said in substance that he was going to get in trouble for what happened to S.S."

The affidavit described the victim's injuries and stated that he "currently is in a coma and his prognosis is dire. One of S.S.'s treating physicians opined that in light of the nature and extent of injuries suffered by S.S., he would have sustained them within hours of the initial response of medical personnel at about 3:00 p.m." Sonia further averred that "[m]edical personnel also observed several injuries to S.S. consistent with possible sexual abuse."

Sonia further averred:

> Tommy Page has been interviewed by investigators. Tommy Page claimed that nobody visited the residence . . . while he was with S.S. on November 13 while Danielle Sylvester was absent. Tommy Page also acknowledged that as late as Thursday, November 12, S.S. was active and acting normally. Tommy Page initially claimed in substance that while S.S. was with him . . . on November 13, he (Tommy Page) dropped S.S. while trying to clothe him, as a result of which Tommy Page claimed that S.S. hit his head on a headboard. Later in the interview, Tommy Page claimed

4

in substance that S.S. also hit his head on a bathtub spout while bathing. Tommy Page further claimed that while he was "passed out" from drinking alcohol and taking Suboxone and Prozac, he awoke to find S.S. at the bottom of the stairs and crying. Tommy Page assumed that S.S. had fallen down the stairs and returned him to his crib.

Finally, Sonia's affidavit stated that "[a]ccording to Danielle Sylvester and Tommy Page, they have been in communication with each other through their cellular telephones regarding S.S.'s condition and what may have happened to him." It further stated that the defendant "initially consented to a search of his cellular telephone, . . . [but] has since requested that his cellular telephone be returned to him."

Before the trial court, the defendant argued that when the police applied for the warrant, they knew, but failed to specify, that the cell phone "communication" between Sylvester and the defendant "consisted specifically of text messages." The trial court found the distinction immaterial because "the basis for searching the photographs on the defendant's cell phone was based largely on the fact that the defendant and [Sylvester] could have sent photographs using their cell phone's text messaging capabilities." Specifically, the trial court found:

> It is well known that modern smartphones have the capability to send and receive photographs attached to text messages and that users do in fact commonly communicate in this manner. Additionally, many smartphones have the capability to take "screen captures," allowing the user to capture in photographic form whatever is presently displayed on the cell phone's screen. Using such a tool, the defendant could have "screen captured" communications sent to and from [Sylvester] and stored these screen captures among other photographs on his cell phone.

(Footnote omitted.)

As the State points out, the defendant does not contend that these factual findings are clearly erroneous. See Com. v. Dorelas, 43 N.E.3d 306, 308 (Mass. 2016) (concluding that "where there was probable cause that evidence of communications relating to and linking the defendant to the crimes under investigation would be found . . . on the [defendant's] iPhone, and because such communications can be conveyed or stored in photographic form, a search of the photograph files was reasonable"). Rather, he argues that "[a]lthough the court conjured hypothetical possibilities of photographs attached to text messages and 'screen captures' of photographs, Sonia's affidavit contained no reference to these possibilities," and "[e]ven if such

5

hypothetical possibilities are considered, they do not rise to the level of 'fair probability.'" (Citation omitted.) We disagree.

"Because affidavits are to be interpreted in a realistic fashion and with common sense, individual items of information in an affidavit should be read not in isolation, but within the context of the entire affidavit." State v. Cannuli, 143 N.H. 149, 153 (1998) (quotation and citation omitted). Moreover, "[t]he issuing judge is entitled to go beyond the averred facts and draw upon common sense in making reasonable inferences from those facts." United States v. Grimmett, 439 F.3d 1263, 1270 (10th Cir. 2006); see, e.g., State v. Kirsch, 139 N.H. 647, 651 (1995) (upholding magistrate's finding of probable cause on basis that "a common-sense inference about the longevity of child pornography for the sexual abuser of children may reasonably be drawn from the nature of the items themselves" (quotation and citation omitted)).

When the information presented in Sonia's affidavit is viewed in a commonsense manner and permissible reasonable inferences are drawn from the facts averred, we conclude that the issuing magistrate "had a substantial basis for concluding that there was a fair probability" that photographs with evidentiary significance to the crimes under investigation would be found on the defendant's cell phone. In re Search Warrant for 1832 Candia Road, 171 N.H. at 56. The affidavit stated that Sylvester was the mother of the 11-month-old victim, the defendant was her boyfriend, and that Sylvester and the defendant lived together. The affidavit further averred that Sylvester and the defendant had "been in communication with each other through their cellular telephones regarding S.S.'s condition and what may have happened to him." (Emphasis added.)

The issuing magistrate could "draw upon common sense," Grimmett, 439 F.3d at 1270, to find that mothers and other caregivers of young children, including live-in boyfriends, often take pictures of the children in their care with their cell phones and often save on their cell phones pictures of those children taken by themselves and others. The magistrate could also infer that there was a fair probability that two such persons who were communicating about how a young child in their care had been severely injured would send each other pictures of the child to document his appearance when last in the sender's care, or perhaps other explanatory photographs (of, for instance, a heavy piece of furniture or a steep set of stairs that might be claimed to have caused the injuries). As the State argues, Sonia's affidavit "set forth claimed incidents by the defendant and Sylvester that could have caused visible injuries to the victim, any of which could be documented by photograph. These controlling facts and circumstances properly tied 'photographs' sought in the warrant to the 'messages' for which the defendant has conceded probable cause existed." (Citation omitted.) We conclude that Sonia's affidavit established probable cause to search the defendant's cell phone for photographs. Cf. State v. Ball, 164 N.H. 204, 209 (2012) (affidavit averring that

a third person's "cell phone contained sexually explicit images of children and that he used it to transmit such images to others" and that the third person and the defendant "exchanged messages," was "sufficient to support an inference that [the third person] used his cell phone to transmit at least one sexually explicit image of a child to the defendant's cell phone").

The defendant also argues that the trial court applied the wrong legal standard because it "mistakenly interpreted 'photographs' as containers to be opened" rather than as the evidence sought. As the State correctly points out, however, the challenged legal analysis was an alternative ground to the trial court's primary ruling that the warrant was supported by probable cause. Because we affirm the trial court's probable cause ruling, we need not address the defendant's challenge to the trial court's alternative ruling.

B. Particularity

The defendant next argues that "[e]ven if the affidavit established probable cause to search for some photographs, the magistrate's description of the items sought, 'photographs . . . for as far back as possible,' failed to satisfy the particularity requirement." (Citation omitted.) The defendant contends that the command to search "was not limited to photographs related to Sylvester; it was not limited to photographs attached to text messages; it was not limited to screen captures." He also asserts that the enumeration of specific crimes failed to particularize the warrant because, although the warrant asserted that probable cause existed with respect to evidence of specific crimes, the command to search did not repeat that enumeration of crimes. Finally, he argues that the warrant "affirmatively eschewed any temporal limitation by commanding the police to search for text messages and photographs 'for as far back as possible.'" He asserts that "[f]ailure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad." United States v. Ford, 184 F.3d 566, 576 (6th Cir. 1999).

We first reject the defendant's attempt to partition the warrant so that the enumerated crimes do not limit the command to search. We decline to read the warrant in such a hyper-technical fashion. "A warrant need not necessarily survive a hyper-technical sentence diagraming and comply with the best practices of Strunk & White to satisfy the particularity requirement." United States v. Otero, 563 F.3d 1127, 1132 (10th Cir. 2009).

"The degree of specificity required in a search warrant depends upon the nature of the items to be seized," Kirsch, 139 N.H. at 652 (quotation omitted), and "[t]he degree of required exactitude is not readily described in the abstract," State v. Tucker, 133 N.H. 204, 206 (1990). Nevertheless, "[t]he soundest generalization probably is that generic descriptions are inadequate whenever it is reasonably possible for a warrant's applicant or issuing

7

magistrate to narrow its scope by using descriptive criteria for distinguishing objects with evidentiary significance from similar items having no such value." Id. at 207.

Here, the trial court was "not convinced that it would have been reasonably possible for the search warrant" to do so. The court found that although the forensic examiner who searched the defendant's cell phone testified at the suppression hearing that it would have been possible to limit a "search to only those photographs bearing indications that they may pertain to the evidence that the investigators justifiably sought," and, in particular, to "photographs taken on or around November 13, 2015," his "testimony also revealed . . . that using such targeted search procedures could ultimately be ineffective because they could allow evidence subject to seizure under the warrant to go undiscovered. For example, a user could employ various applications or methods to manipulate a file's extension or its date and time signifiers."

Moreover, deletion of a text message used to send a photograph could "caus[e] any record that the photograph was sent via text message to eventually be overwritten, while the photograph itself could still remain on the phone." The forensic examiner noted that file deletion could destroy data indicating when a photograph was taken, sent, or received, while preserving the photograph itself. The forensic examiner's testimony takes on greater significance in light of indications in Sonia's affidavit that the defendant might well have deleted or manipulated data on his cellphone. Specifically, the affidavit noted that the defendant rescinded consent to search his phone and gave police investigators multiple inconsistent accounts of what caused the victim's injuries. On this record, we agree with the trial court that it would not have been reasonably possible to narrow the warrant's scope as to photographs sought. See Tucker, 133 N.H. at 207. Accordingly, we affirm the trial court's ruling as to the warrant's particularity.

Having rejected all of the defendant's challenges to the warrant's validity under the State Constitution, we note that the Federal Constitution offers the defendant no greater protection under these circumstances. See In re Search Warrant for 1832 Candia Rd., Manchester, 171 N.H. at 56-57; Tucker, 133 N.H. at 207; Grimmett, 439 F.3d at 1268-70. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

II. Exclusion of "bad thoughts" statement

The defendant next argues that the trial court erred in denying his request to admit substantively Sylvester's prior statement that she did not want to be left alone with the victim because she was having "bad thoughts." Prior to trial, the State moved to exclude the statement as hearsay and under New Hampshire Rules of Evidence 403 and 404(a). The trial court granted the

State's motion in part and denied it in part. The court ruled that the first part of Sylvester's statement — that she did not want to be left alone with the victim — satisfied the hearsay exception for "then-existing mental, emotional, or physical condition," N.H. R. Ev. 803(3) (capitalization and bolding omitted), but that the statement that "'she had been having bad thoughts'" did not. The court further ruled that although the first part of Sylvester's statement satisfied Rule 803(3), it was nevertheless inadmissible under Rule 403. The court ruled that the statement could, however, "be used solely for impeachment purposes."

During cross-examination, Sylvester denied ever having bad thoughts about the victim or stating that she did not want to be alone with him. She also denied ever telling her stepmother otherwise. The defense thereafter called Sylvester's stepmother as a witness and elicited her testimony that Sylvester had made such a statement. The defendant then asked the court to reconsider its ruling on the statement's admissibility, which the court denied. The court later instructed the jury generally that it could consider a witness's prior inconsistent statement "[i]n deciding whether to believe that witness" but could not "use a statement made before trial as proof that the facts in the statement are true."

On appeal, the defendant argues that the trial court erred in excluding substantively both parts of Sylvester's statement. He contends that had the jury been allowed to consider the statement as substantive evidence, "it might have concluded that a reasonable doubt existed as to whether [he] caused the victim's death." The State counters that the trial court did not err, and even if it did, the error was harmless.

We need not determine whether the trial court erred in excluding the statement, because we agree with the State that even if there was error, it was harmless. See State v. Edic, 169 N.H. 580, 588 (2017).

> The harmless-error doctrine recognizes the principle that the
> central purpose of a criminal trial is to decide the factual question
> of the defendant's guilt or innocence, and promotes public respect
> for the criminal process by focusing on the underlying fairness of
> the trial rather than on the virtually inevitable presence of
> immaterial error.

Id. (quotation omitted). "To establish that an error was harmless, the State must prove beyond a reasonable doubt that the error did not affect the verdict." State v. Peters, 162 N.H. 30, 36 (2011). "This standard applies to both the erroneous admission and exclusion of evidence." Id. An error may be established to be harmless beyond a reasonable doubt if "the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight, and if the evidence that was improperly admitted or excluded is merely cumulative or inconsequential in relation to the strength of the State's evidence

of guilt." Id. "In making this determination, we consider the alternative evidence presented at trial as well as the character of the erroneously admitted or excluded evidence itself." Id.

To convict the defendant of first degree murder as charged in the indictment, the State was required to prove beyond a reasonable doubt that he knowingly caused the victim's death "before, after, while engaged in the commission of, or while attempting to commit felonious sexual assault as defined in RSA 632-A:3." RSA 630:1-a, I(b)(1). The alternative evidence of the defendant's guilt included expert medical testimony that the victim died as a result of multiple injuries, all inflicted "close in time" and within two or three hours before emergency medical responders arrived at approximately 3:00 p.m. Sylvester testified that she left the victim in the defendant's care while she went to a medical appointment and that the victim had no visible bruising, swelling, or injuries when she left the residence. The defendant also stated in his interview with the police that he had been alone with the victim on November 13 while Sylvester went to a doctor's appointment. According to Sylvester's testimony, the testimony of witnesses who saw her during that time, and corroborating video surveillance and other evidence, Sylvester was away from the residence from approximately 12:30 p.m. to 2:30 p.m.

Photographs taken with the defendant's cell phone on November 13 showed the victim having already sustained head injuries prior to 1:09 p.m. and the jury could have inferred from the photographs and expert testimony that the victim was already unconscious by that time. Photographs also showed the defendant sexually abusing the victim between 1:09 p.m. and 1:14 p.m. Finally, the defendant gave the police inconsistent accounts of what had happened to the victim, which shows a consciousness of guilt. See State v. Bean, 153 N.H. 380, 387 (2006) (noting jury could have found defendant's "inconsistent and evasive answers" to police to be "further evidence of [his] consciousness of guilt").

Compared to this evidence of the defendant's guilt, the statement he sought to introduce substantively was inconsequential. The defendant sought to introduce the statement as evidence tending to prove that Sylvester, not the defendant, murdered the victim. In arguing that the probative value of the statement "was considerable," the defendant asserts: "Only two people had access to the victim during [the relevant] time, and Sylvester was one of them. The fact that Sylvester did not want to be alone with the victim — her own son — was thus probative of the identity of the perpetrator."

To the contrary, we conclude that, even considered on its own, the probative value of the statement was minimal. As the trial court found:

> Sylvester made this statement approximately six months prior to S.S.'s death. This lack of temporal proximity to the events at

10

issue, coupled with the lack of any evidence that Ms. Sylvester actually inflicted physical harm to her son, means that her prior statement is hardly relevant to proving that she had a motive to murder S.S.

When considered in relation to the strength of the State's evidence of guilt, including photographic evidence from which the jury could have found that the defendant had already fatally injured the victim before Sylvester returned home, the alternative perpetrator evidence the defendant sought to introduce was inconsequential. See Peters, 162 N.H. at 38. We conclude that the State has proved beyond a reasonable doubt that the error, if any, did not affect the verdict on the first degree murder charge. See id. at 36.

III. Jury Instruction

The defendant next argues that the trial court erred by failing to instruct the jury that in order to find him guilty of first degree murder, it had to find that he "was aware that his conduct was 'practically certain' to cause the victim's death." The defendant raises this issue as plain error.

> For us to find plain error: (1) there must be error; (2) the error must be plain; and (3) the error must affect substantial rights. If all three of these conditions are met, we may then exercise our discretion to correct a forfeited error only if the error meets a fourth criterion: the error must seriously affect the fairness, integrity or public reputation of judicial proceedings. This rule is used sparingly, however, and is limited to those circumstances in which a miscarriage of justice would otherwise result.

State v. Mueller, 166 N.H. 65, 68 (2014) (quotation and ellipsis omitted). Here, we need not address the first three prongs of the test because we conclude that, even assuming, without deciding, that they are satisfied, the fourth is not. Cf. State v. Russell, 159 N.H. 475, 490-92 (2009) (noting State's concession that first two prongs were met, assuming without deciding that third prong was met, and concluding that fourth prong was not satisfied).

"Under the fourth prong, we must decide whether the trial court's error seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. at 491 (quotation and brackets omitted). In Russell, we concluded that the trial court's failure to instruct the jury that it must unanimously conclude that the deadly weapon used by the defendant during the charged robbery was a firearm did not "seriously affect[] the fairness, integrity or public reputation of judicial proceedings" where "the evidence presented at trial that the defendant used a firearm to commit the charged offense was overwhelming." Id. at 490, 491, 492 (quotation omitted); see also State v. Ortiz, 162 N.H. 585, 591, 592 (2011) (trial court did not "commit[]

11

plain error by instructing the jury that the <u>mens</u> <u>rea</u> for the [charged offense] was 'knowingly' instead of 'purposely'" where "the evidence that the defendant acted purposely was overwhelming and essentially uncontroverted").

In the instant case, the evidence that the defendant "was aware that his conduct was 'practically certain' to cause the victim's death" was overwhelming. Several medical experts testified as to the number, nature, and extent of the victim's injuries, the amount of force that must have been used to inflict them, and the immediate effect they would have had on the victim. One expert testified that the victim suffered "multiple blunt impact injuries to his head[,] . . . mean[ing] that either somebody impacted his head violently multiple times or his head was impacted against something multiple times violently." The expert continued: "Whether that is somebody's fist or somebody's foot or a wall or a table, I don't know. I wasn't there. But his head was struck multiple times." Another expert described the type of skull fractures the victim sustained as "indicating significant force." They were not the type of fractures "that a child gets . . . falling over in play . . . but [were] much more complex fractures indicating a lot of energy in the mechanism to cause the fracture." The expert opined as to how such injuries could be inflicted: "[A] child could have something thrown at them such that the skull was crushed between that object and a floor or a wall, another hard object. They could be kicked or conceivably punched . . . so that both sides of the skull were impacted, or the skull crushed" or "stomp[ed]" on. A third expert echoed those opinions:

> So you're talking multiple blows, including at least . . . very substantial forces acting on both sides of the head to cause that fracture pattern and the brain injuries that resulted. . . . [S]o multiple blows or I suppose it could be a crushing type of scenario similar to the heavy furniture being toppled over onto a young child, you could have a stomping type of injury.

As one expert testified succinctly: "This is really classic . . . child physical abuse in its most severe and horrible form. I mean the child was beaten to death."

The victim suffered additional injuries that, while nonfatal, evidenced severe violence. He sustained "a full fracture to the tibia" or shin bone and "quite a terrible fracture of the distal part of the humerus, which is the upper . . . bone in the arm." One expert testified that the victim's "arm was probably forcefully kind of yanked or moved in a way that just broke that arm in half in quite an unusual fracture." That expert's testimony also suggested that the victim's leg fracture indicated a possible violent mechanism for his other injuries: "That fracture was somewhat spiral or slanted across the bone . . . suggest[ing] that that bone underwent some severe forces in somewhat of a

twisting mechanism. Whether somebody grabbed him by the leg and potentially hit him against something, that's possible."

Finally, when questioned as to how soon the victim would "appear outwardly to have been suffering the effects of these injuries," the medical examiner who performed the victim's autopsy testified:

> Well, I think there would be rapid loss of consciousness, maybe almost immediately and within a few minutes at most. And then the brain swelling is going to start and that's what's going to compromise his ability to breathe and, you know, put him in a comatose situation. And that's going to take minutes, maybe several minutes. It's not going to take hours. He's not going to be able to survive these injuries independently without life support for hours and hours. So the range I'm giving you is minutes to two, three hours max.

Given this overwhelming evidence as to the victim's devastating injuries, we find no basis for concluding that the alleged error seriously affected the fairness, integrity or public reputation of judicial proceedings. Russell, 159 N.H. at 491; cf. Bey v. Ricci, 394 F. App'x 908, 909-10, 911-12 (3d Cir. 2010) (denying federal habeas relief for alleged failure of jury instructions to distinguish between the offenses of "purposely or knowingly causing serious bodily injury resulting in death . . . as opposed to purposely or knowingly causing death" where the defendant "not only strangled the victim from behind, he also smashed her face hard enough to break her dental plate and cause cerebral hemorrhaging, and he stomped on her chest with enough force to crush her ribs, damage her heart and inscribe his sneaker sole on her chest" (quotation omitted)); People v. Glenn, 484 N.E.2d 1204, 1207-08 (Ill. App. Ct. 1985) (misstatements by prosecutor and court as to requirement of proving defendant's knowledge that his acts would cause victim's death were not reviewable for plain error where evidence of defendant's mental state was overwhelming; defendant, "a police officer familiar with guns, certainly must have been consciously aware shooting [victim] seven times, including three times in the head, was practically certain to cause [the victim's] death").

Affirmed.

LYNN, C.J., and BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.